# EXHIBIT A

Skip To MainContent

[                    ] [ Search ]

Civil Court Case Information - Case History

### Case Information

Case Number:    CV2018-012446      Judge:      Welty, Joseph
File Date:       9/23/2018          Location:   Downtown
Case Type:       Civil

### Party Information

| Party Name | Relationship | Sex | Attorney |
|---|---|---|---|
| Michael Petramala | Plaintiff | Male | Pro Per |
| City Of Scottsdale | Defendant | | Lori Davis |

### Case Documents

| Filing Date | Description | Docket Date | Filing Party |
|---|---|---|---|
| 1/4/2019 | NOT - Notice | 1/4/2019 | |
| **NOTE:** Notice of Withdrawal of Defendant's Motion to Dismiss | | | |
| 12/26/2018 | RES - Response | 12/26/2018 | Plaintiff(1) |
| **NOTE:** PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION TO DISMISS | | | |
| 12/26/2018 | MTD - Motion To Dismiss | 12/26/2018 | |
| **NOTE:** Motion to Dismiss // REC#26961288 | | | |
| 12/24/2018 | AFS - Affidavit Of Service | 12/26/2018 | |
| **NOTE:** Affidavit of Service | | | |
| 12/18/2018 | SUM - Summons | 12/21/2018 | Plaintiff(1) |
| 12/18/2018 | AFS - Affidavit Of Service | 12/26/2018 | |
| **NOTE:** CITY OF SCOTTSDALE | | | |
| 12/3/2018 | AFS - Affidavit Of Service | 12/3/2018 | Plaintiff(1) |
| **NOTE:** CERTIFICATE OF SERVICE ON DEFENDANT CITY OF SCOTTSDALE | | | |
| 11/28/2018 | 322 - ME: Notice Of Intent To Dismiss | 11/28/2018 | |
| 9/23/2018 | COM - Complaint | 9/25/2018 | Plaintiff(1) |
| 9/23/2018 | CSH - Coversheet | 9/25/2018 | Plaintiff(1) |
| 9/23/2018 | CCS - Cerificate Arbitration - Subject To | 9/25/2018 | Plaintiff(1) |
| 9/23/2018 | ADW - Application Deferral/Waiver | 9/25/2018 | Plaintiff(1) |
| 9/23/2018 | ODF - Order Deferring Court Fees | 9/25/2018 | |

### Case Calendar

**There are no calendar events on file**

### Judgments

**There are no judgments on file**

**In the Superior Court of the State of Arizona
in and for the County of** _Maricopa_

# CV2018-012446

(Please Type or Print)

| | |
|---|---|
| **Is Interpreter Needed?** ☐ Yes ☒ No | |
| **If yes, what language:** | |

FILED 9:08 PM

SEP 2 3 2018

CHRIS DEROSE, Clerk

By _S. Hughes_
S. Hughes, Deputy

**Plaintiff's Attorney** _Pro Se_

**Attorney Bar Number** _n/a_

**Plaintiff's Name(s): (List all)**     **Plaintiff's Address:**     **Phone #:**     **Email Address:**

Michael Petramala PO Box 60222, Phoenix, AZ 85082

(List additional Plaintiffs on page two and/or attach a separate sheet).

**Defendant's Name(s): (List All)**

City of Scottsdale

(List additional Defendants on page two and/or attach a separate sheet)

## NATURE OF ACTION

(Place an **"X"** next to the <u>one</u> case category that most accurately describes your primary case.)

**100 TORT MOTOR VEHICLE:**

☐101 Non-Death/Personal Injury
☐102 Property Damage
☐103 Wrongful Death

**110 TORT NON-MOTOR VEHICLE:**

☐111 Negligence
☐112 Product Liability – Asbestos
☐112 Product Liability – Tobacco
☐112 Product Liability – Toxic/Other
☐113 Intentional Tort

☐114 Property Damage
☐115 Legal Malpractice
☐115 Malpractice – Other professional
☐117 Premises Liability
☐118 Slander/Libel/Defamation
☐116 Other (Specify) _____

**120 MEDICAL MALPRACTICE:**

☐121 Physician M.D.    ☐123 Hospital
☐122 Physician D.O    ☐124 Other

**130 CONTRACTS:**

☐131 Account (Open or Stated)
☐132 Promissory Note
☐133 Foreclosure
☐138 Buyer-Plaintiff
☐139 Fraud
☐134 Other Contract (i.e. Breach of Contract)
☐135 Excess Proceeds-Sale
☐Construction Defects (Residential/Commercial)
    ☐136 Six to Nineteen Structures
    ☐137 Twenty or More Structures

**150-199 OTHER CIVIL CASE TYPES:**

☐156 Eminent Domain/Condemnation
☐151 Eviction Actions (Forcible and Special Detainers)
☐152 Change of Name
☐153 Transcript of Judgment
☐154 Foreign Judgment
☐158 Quiet Title
☐160 Forfeiture
☐175 Election Challenge
☐179 NCC-Employer Sanction Action
    (A.R.S. §23-212)

Case No._____

☐ 180 Injunction against Workplace Harassment
☐ 181 Injunction against Harassment
☐ 182 Civil Penalty
☐ 186 Water Rights (Not General Stream Adjudication)
☐ 187 Real Property
☐ Special Action against Lower Courts
  (See Lower Court Appeal cover sheet in Maricopa)
☐ 194 Immigration Enforcement Challenge
  (A.R.S. §§1-501, 1-502, 11-1051)

**150-199 UNCLASSIFIED CIVIL:**

☐ Administrative Review
  (See Lower Court Appeal cover sheet in Maricopa)
☐ 150 Tax Appeal
  (All other tax matters must be filed in the AZ Tax
  Court)
☐ 155 Declaratory Judgment
☐ 157 Habeas Corpus
☐ 184 Landlord Tenant Dispute- Other
☐ 190 Declaration of Factual Innocence
  (A.R.S. §12-771)

☐ 191 Declaration of Factual Improper Party Status
☐ 193 Vulnerable Adult (A.R.S. §46-451)
☐ 165 Tribal Judgment
☐ 167 Structured Settlement (A.R.S. §12-2901)
☐ 169 Attorney Conservatorships (State Bar)
☐ 170 Unauthorized Practice of Law (State Bar)
☐ 171 Out-of-State Deposition for Foreign Jurisdiction
☐ 172 Secure Attendance of Prisoner
☐ 173 Assurance of Discontinuance
☐ 174 In-State Deposition for Foreign Jurisdiction
☐ 176 Eminent Domain- Light Rail Only
☐ 177 Interpleader- Automobile Only
☐ 178 Delayed Birth Certificate (A.R.S. §36-333.03)
☒ 183 Employment Dispute- Discrimination
☐ 185 Employment Dispute-Other
☐ 196 Verified Rule 45.2 Petition
☐ 195(a) Amendment of Marriage License
☐ 195(b) Amendment of Birth Certificate
☒ ~~163 Other ADA~~
            **(Specify)**

**RULE 26.2 DISCOVERY TIER or AMOUNT PLEADED:**
(State the amount in controversy pleaded or place an "X" next to the discovery tier to which the pleadings allege the case
would belong under Rule 26.2.)

☐ Amount Pleaded $ _____     ☐ Tier 1     ☐ Tier 2     ☐ Tier 3

**EMERGENCY ORDER SOUGHT**

☐ Temporary Restraining Order     ☐ Provisional Remedy     ☐ OSC     ☐ Election Challenge
☐ Employer Sanction               ☐ Other (Specify) _____

**COMMERCIAL COURT (Maricopa County Only)**

☐ This case is eligible for the Commercial Court under Rule 8.1, and Plaintiff requests assignment of this case to the
commercial Court. More information on the commercial Court, including the most recent forms, are available on the
Court's website at https://www.superiorcourt.maricopa.gov/commercial-court/.

**Additional Plaintiff(s):**

_____

_____

**Additional Defendant(s):**

_____

_____

18009905

ORIGINAL

210

CHRIS DEROSE, CLERK
RECEIVED CCB #2
DOCUMENT REPOSITORY

18 DEC 18 PM 3: 23

FILED BY: _I. Bridges_

For Clerk's Use Only

Person Filing: _Michael Petramala_
Address (if not protected): _Po Box 60222_
City, State, Zip Code: _Phoenix Az 85082_
Telephone: _____
Email Address: _____
Lawyer's Bar Number: _____

Representing ☒ Self, without a Lawyer  or  ☐ Attorney for  ☐ Plaintiff  OR  ☐ Defendant

# SUPERIOR COURT OF ARIZONA
# IN MARICOPA COUNTY

_Michael Petramala_
Name of Plaintiff

And

_City of Scottsdale_
Name of Defendant

Case No.: _CV2018 - 012446_

## SUMMONS

IF YOU WANT ... ... ... ... ... ... ... ... ..., YOU MAY
WISH TO ... ... ... ... ... ... ... ... ... ... SERVICE AT
... ... ... ... ... ... ... ... ... ... ... ... .ORG
... ... ... ... ... ... ... ... ... ... ... COUNTY
BAR ASSOC... ...

> **WARNING: This is an official document from the court that affects your rights. Read this carefully.**
> **If you do not understand it, contact a lawyer for help.**

FROM THE STATE OF ARIZONA TO: _City of Scottsdale_
Name of Defendant

1.  A lawsuit has been filed against you.  A copy of the lawsuit and other court papers are served on you with this *"Summons"*.

2.  If you do not want a judgment or order taken against you without your input, you must file an *"Answer"* or a *"Response"* in writing with the court, and pay the filing fee. If you do not file an *"Answer"* or *"Response"* the other party may be given the relief requested in his/her Petition or Complaint.  To file your *"Answer"* or *"Response"* take, or send, the *"Answer"* or *"Response"* to the:

-   **Office of the Clerk of the Superior Court, 201 West Jefferson Street, Phoenix, Arizona 85003-2205** *OR*

-   **Office of the Clerk of the Superior Court, 18380 North 40th Street, Phoenix, Arizona 85032** *OR*

-   **Office of the Clerk of Superior Court,  222 East Javelina Avenue, Mesa, Arizona  85210-6201** *OR*

-   **Office of the Clerk of Superior Court, 14264 West Tierra Buena Lane, Surprise, Arizona, 85374.**

Mail a copy of your *"Response"* or *"Answer"* to the other party at the address listed on the top of this Summons.

© Superior Court of Arizona in Maricopa County
ALL RIGHTS RESERVED

CV11f -092917

Case Number: _____

3.  If this *"Summons"* and the other court papers were served on you by a registered process server or the Sheriff, within the State of Arizona, your *"Response"* or *"Answer"* must be filed within TWENTY (20) CALENDAR DAYS from the date you were served, not counting the day you were served.  If this *"Summons"* and the other papers were served on you by a registered process server or the Sheriff outside the State of Arizona, your Response must be filed within THIRTY (30) CALENDAR DAYS from the date you were served, not counting the day you were served. Service by a registered process server or the Sheriff is complete when made. Service by Publication is complete thirty (30) days after the date of the first publication.

4.  You can get a copy of the court papers filed in this case from the Petitioner at the address listed at the top of the preceding page, from the Clerk of the Superior Court's Customer Service Center at:

    *   601 West Jackson, Phoenix, Arizona 85003
    *   18380 North 40th Street, Phoenix, Arizona 85032
    *   222 East Javelina Avenue, Mesa, Arizona  85210
    *   14264 West Tierra Buena Lane, Surprise, Arizona, 85374.

5.  Requests for reasonable accommodation for persons with disabilities must be made to the office of the judge or commissioner assigned to the case, at least ten (10) judicial days before your scheduled court date.

6.  Requests for an interpreter for persons with limited English proficiency must be made to the office of the judge or commissioner assigned to the case at least ten (10) judicial days in advance of your scheduled court date.

SIGNED AND SEALED this date

DEC 0 3 2018

CHRIS DEROSE, CLERK OF SUPERIOR COURT

Deputy Clerk

E. Vazquez
Deputy Clerk

© Superior Court of Arizona in Maricopa County
ALL RIGHTS RESERVED

CV11f -092917

Michael Petramala
Post Office Box 60222
Phoenix, Arizona 85082
Plaintiff Pro Se

CHRIS DEROSE, CLERK
RECEIVED CCC #3
NIGHT DEPOSITORY

18 SEP 23 PM 9: 09

**FILED**
**BY S. HUGHES, DEP**

## IN THE MARICOPA COUNTY SUPERIOR COURT

### STATE OF ARIZONA

**PAID**
Jl 333 D
Receipt #
26816416

|  |  |  |
|---|---|---|
| Michael Petramala, | ) | CV 2018-012446 |
| | ) | |
| Plaintiff, | ) | Maricopa County Superior Court |
| | ) | No. |
| v. | ) | |
| | ) | (Telephonic Oral Argument Requested) |
| City of Scottsdale, | ) | |
| | ) | **CIVIL COMPLAINT – ADA** |
| Defendant. | ) | **EMPLOYMENT DISCRIMINATION** |
| | ) | |
| | ) | |
| | ) | |

### COUNT ONE

### VIOLATION OF THE AMERICANS WITH DISABILITY ACT (ADA)

At all times material hereto, Plaintiff was an applicant for employment in the City of Scottsdale and Petramala was informed by the Scottsdale risk manager, Marc, that he was denied employment.

While the job has no experience required and only a high school diploma required, Petramala has a college degree.

Petramala also has years of hands on real world legal experience in the Arizona state courts, Nevada state courts, the Federal District Courts, the Ninth Circuit Court of Appeals, and the Court of Appeals for the Federal Circuit, including jury trials and appellate brief writing experience.

Petramala is covered by and within the meaning of Title I of the Americans with Disabilities Act of 1990 (ADA), 42 USC 12111(5)(a).

At all times material hereto, Plaintiff was and is an individual with a disability within the meaning of §3(2) of the ADA, 42 USC 12102(2).

Plaintiff is a qualified individual with a disability as that term is defined in the ADA, 42 USC 12111(8).

Plaintiff's skin disability includes but is not limited to a sun sensitivity, which is a physical impairment that substantially limits one or more major life activities in the daytime hours.

Plaintiff has a record of a mental defect caused by the City of Scottsdale that substantially limits one or more major life activities including NICS civil rights under the second amendment, hunting, lawful self defense, range/target practice for sport, socialisation/recreation, and/or competition, and employment.

Scottsdale engaged disability apartheid in regards to NICS, which is a Jim Crow anti-disabled database abridging the second amendment.

Defendants were aware of Plaintiff's disability and in fact proximately caused a portion of it and are actively thwarting Petramala's disability rehabilitation by denying him employment to earn money for NICS fees.

Defendants regarded Plaintiff's as having a disability, which substantially limited one or more major life activities.  Further Plaintiff requested an ADA reasonable accommodation for hours of work adjustment pursuant to the holdings of US Airways, Inc. v. Barnett, 535 U.S. 391 (2002).

Plaintiff's disability, and/or record of a disability, and/or perceived disability was a factor that made a difference in Defendants' decision to discriminate against him in failing to hire or grant the employment accommodations requested to the Scottsdale human resources department.

Defendants were predisposed to discriminate on the basis of disability and/or record of a disability and/or perceived disability and acted in accordance with that predisposition.

The actions of Defendants were intentional and willful, in deliberate disregard of and with reckless indifference to the rights and sensibilities of Plaintiff.

As a direct and proximate result of Defendants' violation of Plaintiff's rights as alleged, Plaintiff's terms, conditions, and privileges of employment or lack thereof were adversely affected as delineated in Petramala's notice of claim pursuant to A.R.S. § 12-821.01(A) dated and/or served on Defendants on or about July 24, 2018.

As a direct and proximate result of Defendants' wrongful acts and omissions, Plaintiff has sustained injuries and damages including but not limited to, loss of earnings and earning capacity; loss of career opportunities; loss of fringe and pension benefits; mental anguish, physical and emotional distress; humiliation and embarrassment; loss of professional reputation; and loss of the ordinary pleasures of everyday life, including the right to pursue the gainful employment of his choice.

<u>Relief Requested</u>

For all of the foregoing reasons, Plaintiff Petramala demands judgment against Defendants as follows:

A.      **Legal Relief:**

1.      Compensatory damages in whatever amount he is found to be

        entitled;

2.      Exemplary and punitive damages in whatever amount he is found

        to be entitled;

3.       A judgment for lost wages and benefits, past and future, in

        whatever amount he is found to be entitled; and,

4.       An award of interest, costs and reasonable attorney fees.

B.    **Equitable Relief:**

1.      An order out of this court installing Plaintiff to the position he

        would have held had there been no wrongdoing by Defendants;

2.      An injunction out of this court prohibiting any further acts of

        discrimination or retaliation;

3.      An award of interest, costs and reasonable attorney fees; and,

4.      Whatever other equitable relief appears appropriate at the time of

        final judgment.

RESPECTFULLY SUBMITTED this 24th day of September, 2018.

                                    By      /s/  Michael Petramala
                                            Michael Petramala
                                            Post Office Box 60222
                                            Phoenix, Arizona 85082
                                            Plaintiff Pro Se

Copies of the foregoing this day to:

Scottsdale City Attorney's Office
3939 N Drinkwater Blvd.
Scottsdale, AZ 85251
P: 480-312-2405
F: 480-312-2548
Bwashburn@scottsdaleaz.gov

CHRIS DEROSE, CLERK
RECEIVED CCC #3
NIGHT DEPOSITORY

18 SEP 23  PM 9:09

FOR CLERK'S USE ONLY
FILED
BY  S. HUGHES, DEP

**Person Filing:** Michael Petramala
**Address (if not protected):** PO Box 60222
**City, State, Zip Code:** Phoenix, AZ 85082
**Telephone:**
**Email Address:**
**Lawyer's Bar Number:**

**Representing** ☒ **Self, without a Lawyer  or**  ☐ **Attorney for**  ☐ **Petitioner  OR**  ☐ **Respondent**

# SUPERIOR COURT OF ARIZONA
# IN MARICOPA COUNTY

Michael Petrama

PLAINTIFF,

vs.

City of Scottsdale

DEFENDANT.

CV 2018-012446

**Case Number:** _____

# CERTIFICATE OF COMPULSORY ARBITRATION

The undersigned certifies that the largest award sought by the complainant, including punitive damages, but excluding interest, attorneys' fees, and costs **does / does not** exceed limits set by Local Rule for compulsory arbitration.  This case **is / is not** subject to compulsory arbitration as provided in Rules 72 through 77 of the Rules of Civil Procedure.

SUBMITTED this 24th day of September, 2018.

BY _____

CHRIS DEROSE, CLERK
RECEIVED CCC #3
NIGHT DEPOSITORY

18 SEP 23 PM 9: 08

**FILED**
BY S. HUGHES, DEP

**Person Filing:** Michael Petramala
**Address (if not protected):** PO Box 60222
**City, State, Zip Code:** Phoenix, AZ 85082
**Telephone:**
**Email Address:**
**Lawyer's Bar Number:**

Representing ☒ Self, without a Lawyer  or  ☐ Attorney for  ☐ Petitioner  OR  ☐ Respondent

# SUPERIOR COURT OF ARIZONA
# IN MARICOPA COUNTY

Michael Petrama
**Name of Petitioner/Plaintiff**

City of Scottsdale
**Name of Respondent/Defendant**

**Case Number:** CV 2018-012446

**APPLICATION FOR DEFERRAL OR WAIVER OF COURT FEES OR COSTS AND CONSENT TO ENTRY OF JUDGMENT**

**STATE OF ARIZONA**              )
                                  ) ss.
**COUNTY OF** Maricopa            )

**Notice. A Fee Deferral is only a temporary postponement of the payment of the fees due. You may be required to make payments depending on your income. A Fee Waiver is usually permanent unless your financial circumstances change during the pendency of this court action.**

I am requesting a deferral or waiver of all fees including: filing a case, issuance of a summons or subpoena, the cost of attendance at an educational program required by A.R.S. § 25-352, one certified copy of a temporary order in a family law case, one certified copy of the court's final order, preparation of the record on appeal, court reporter's fees of reporters or transcribers, service of process costs, and/or service by publication costs. (I have completed the separate Supplemental Information form if I am asking for service of process costs, or service by publication costs.) I understand that if I request deferral or waiver because I am a participant in a government assistance program, I am required to provide proof at the time of filing. The document(s) submitted must show my name as the recipient of the benefit and the name of the agency awarding the benefit. **Note. All other applicants must complete the financial questionnaire beginning at section 3. If you are a participant in one of the programs in section 1 or 2 (below), you do not need to complete the financial questionnaire, and can proceed to the signature page.**

1.  ☐ **DEFERRAL:** I receive government assistance from the state or federal program marked below or am represented by a not for profit legal aid program:

    ☐ Temporary Assistance to Needy Families (TANF)
    ☐ Food Stamps
    ☐ Legal Aid Services

2.  ☒ **WAIVER:**

    ☒ I receive government assistance from the federal Supplemental Security Income (SSI) program.

Case Number: _____

**3.  FINANCIAL QUESTIONNAIRE**
**SUPPORT RESPONSIBILITIES.** List all persons you support (including those you pay child support and/or spousal maintenance/support for):

**NAME**                                              **RELATIONSHIP**

_____          _____
_____          _____
_____          _____

**STATEMENT OF INCOME AND EXPENSES**

Employer name:_____
Employer phone number:_____
[ ] I am unemployed (explain):_____
_____

My prior year's gross income:                                    $_____

**MONTHLY INCOME**

My total monthly gross income:                                   $_____
My spouse's monthly gross income (if available to me):           $_____
Other current monthly income, including spousal maintenance/support,
retirement, rental, interest, pensions, and lottery winnings:    $_____

**TOTAL MONTHLY INCOME**                                         $_____

**MONTHLY EXPENSES AND DEBTS:** My monthly expenses and debts are:

|                          | PAYMENT AMOUNT | LOAN BALANCE |
|--------------------------|----------------|--------------|
| Rent/Mortgage payment    | $_____  | $_____  |
| Car payment              | $_____  | $_____  |
| Credit card payments     | $_____  | $_____  |
| Explain: _____ |               |              |
| Other payments & debts   | $_____  | $_____  |
| Household                | $_____  |              |
| Utilities/Telephone/Cable | $_____ |              |
| Medical/Dental/Drugs     | $_____  |              |
| Health insurance         | $_____  |              |
| Nursing care             | $_____  |              |
| Tuition                  | $_____  |              |
| Child support            | $_____  |              |
| Child care               | $_____  |              |
| Spousal maintenance      | $_____  |              |
| Car insurance            | $_____  |              |
| Transportation           | $_____  |              |
| Other expenses (explain) | $_____  |              |

**TOTAL MONTHLY EXPENSES**                                       $_____

© Superior Court of Arizona in Maricopa County
ALL RIGHTS RESERVED
ADW

GNF11f  - 060115
Use current version

Case Number: _____

**STATEMENT OF ASSETS:** List only those assets available to you and accessible without financial penalty.

|  | ESTIMATED VALUE |
|---|---|
| Cash and bank accounts | $_____ |
| Credit union accounts | $_____ |
| Other liquid assets | $_____ |
| **TOTAL ASSETS** | $_____ |

## The basis for the request is:

**4.** ☐ **DEFERRAL:**

**A.** ☐ My income is insufficient or is barely sufficient to meet the daily essentials of life, and includes no allotment that could be budgeted for the fees and costs that are required to gain access to the court. My gross income as computed on a monthly basis is 150% or less of the current federal poverty level. (Note: Gross monthly income includes your share of community property income if available to you.)

OR

**B.** ☐ I do not have the money to pay court filing fees and/or costs now. I can pay the filing fees and/or costs at a later date. **Explain.**

_____

_____

OR

**C.** ☐ My income is greater than 150% of the poverty level, but have proof of extraordinary expenses (including medical expenses and costs of care for elderly or disabled family members) or other expenses that reduce my gross monthly income to 150% or below the poverty level.

| DESCRIPTION OF EXPENSES | AMOUNT |
|---|---|
| _____ | $_____ |
| _____ | $_____ |
| _____ | $_____ |
| **TOTAL EXTRAORDINARY EXPENSES** | $_____ |

**5.** ☒ **WAIVER:**

I am permanently unable to pay. My income and liquid assets are insufficient or barely sufficient to meet the daily essentials of life and are unlikely to change in the foreseeable future.

---

**IMPORTANT**

This *"Application for Deferral or Waiver of Court Fees or Costs"* includes a *"Consent to Entry of Judgment."* By signing this Consent, you agree a judgment may be entered against you for all fees and costs that are deferred but remain unpaid thirty (30) calendar days after entry of final judgment. At the conclusion of the case you will receive a *Notice of Court Fees and Costs Due* indicating how much is owed and what steps you must take to avoid a judgment against you if you are still participating in a qualifying program. You may be ordered to repay any amounts that were waived if the court finds you were not eligible for the fee deferral or waiver. If your case is dismissed for any reason, the fees and costs are still due.

---

© Superior Court of Arizona in Maricopa County
ALL RIGHTS RESERVED
ADW

GNF11f - 060115
Use current version

Case Number: _____

**CONSENT TO ENTRY OF JUDGMENT.** By signing this Application, I agree that a judgment may be entered against me for all fees or costs that are deferred but remain unpaid thirty (30) calendar days after entry of final judgment.

# OATH OR AFFIRMATION

I declare under penalty of perjury that the foregoing is true and correct.

9/23/18
_____
Date

_____
Signature

MICHAEL PERRAMADA
_____
Applicant's Printed Name

9/23/18
_____
Date

_____
Judicial Officer, Deputy Clerk or Notary Public

03 - 06 - 2022
_____
My Commission Expires/Seal:

**ACKNOWLEDGEMENT SAMPLE:**

State of Arizona )
County of Maricopa )

On this 23 day of Sept 2018 before me personally
[Day]       [Month]       [Year]
appeared Michael Thomas Peramay whose identity was proven
[Name of Signer]
to me on the basis of satisfactory evidence to be the person who he or she claims to
be, and acknowledged that he or she signed the above/attached document.

(seal)
[Affix Seal Here]       Notary Public—Notary Public Signature

Antonio Gonzalez
NOTARY PUBLIC - ARIZONA
MARICOPA COUNTY
My Commission Expires
March 6, 2022

# Social Security Administration

Date:  June 1, 2018
BNC#:  18BT063B33662
REF:  DI

002965 1 MB 0.424 P002 T0007 LTR BEV 0601
**MICHAEL THOMAS PETRAMALA**
PO BOX 60222
PHOENIX AZ 85082-0222

You asked us for information from your record.  The information that you requested is shown below.  If you want anyone else to have this information, you may send them this letter.

## Information About Supplemental Security Income Payments

Beginning January 2018, the current Supplemental Security Income payment is $ 750.00.

This payment amount may change from month to month if income or living situation changes.

Supplemental Security Income Payments are paid the month they are due. (For example, Supplemental Security Income Payments for March are paid in March.)

## Date of Birth Information

The date of birth shown on our records is August 3, 1974.

## Type of Supplemental Security Income Payment Information

You are entitled to monthly payments as a disabled individual.

 ## Suspect Social Security Fraud?

Please visit http://oig.ssa.gov/r or call the Inspector General's Fraud Hotline at 1-800-269-0271 (TTY 1-866-501-2101).

See Next Page

Person Filing: **Michael Petramala**
Address (if not protected): **PO Box 60222**
City, State, Zip Code: **Phoenix, AZ 85082**
Telephone: _____
Email Address: _____
Lawyer's Bar Number: _____

SEP **2**3 2018  FILED **9:08 pm**
**CHRIS DEROSE, Clerk**
By **S. Hughes**
S. Hughes, Deputy

Representing  ☒ Self, without a Lawyer  or  ☐ Attorney for  ☐ Petitioner  OR  ☐ Respondent

# SUPERIOR COURT OF ARIZONA
# IN MARICOPA COUNTY

**Michael Petramala**
**Name of Petitioner/Plaintiff**

Case Number: **CV 2018-012446**

**ORDER REGARDING DEFERRAL OR WAIVER
OF COURT FEES AND COSTS AND
NOTICE REGARDING CONSENT JUDGMENT**

**City of Scottsdale**
**Name of Respondent/Defendant**

---

**NOTE: ONLY FILL OUT THE ABOVE INFORMATION. THE COURT WILL FILL OUT
THE REST OF THE FORM.**

---

**THE COURT FINDS** that the applicant (print name) **Michael Petramala** :

1. ☐ IS NOT ELIGIBLE FOR A DEFERRAL of fees and costs.
   **OR**

2. ☒ IS ELIGIBLE FOR A DEFERRAL of fees and costs based on financial eligibility. As required by state law, the applicant has signed a consent to entry of judgment.
   **OR**

3. ☐ IS ELIGIBLE FOR A DEFERRAL of fees and costs at the court's discretion (A.R.S. § 12-302(L)).
   **OR**

4. ☐ IS ELIGIBLE FOR A DEFERRAL of fees and costs based on good cause shown. As required by state law, the applicant has signed a consent to entry of judgment.
   **OR**

5. ☐ IS ELIGIBLE FOR A WAIVER of fees and costs because the applicant is permanently unable to pay.
   **OR**

6. ☐ IS ELIGIBLE FOR A WAIVER of fees and costs at the court's discretion (A.R.S. § 12-302(L)).
   **OR**

7. ☐ IS NOT ELIGIBLE FOR A WAIVER of fees and costs.

© Superior Court of Arizona in Maricopa County
ALL RIGHTS RESERVED                    Page 1 of 3

GNF18f - 071017
Use current version

Case Number: _____

## IT IS ORDERED:

☐ **DEFERRAL IS DENIED** for the following reason(s):

☐ The application is incomplete because _____

**You are encouraged to submit a complete application.**

☐ The applicant does not meet the financial criteria for deferral because _____

_____

**A deferral MUST BE granted if the applicant is receiving public assistance benefits from the Temporary Assistance to Needy Families (TANF) program or Food Stamps; presents documentation they are currently receiving services from a non-profit legal services organization; has an income that is insufficient or barely sufficient to meet the daily essentials of life and that includes no allotment that could be budgeted to pay the fees and costs necessary to gain access to the court; or, if the applicant demonstrates other good cause.**

☒ **DEFERRAL IS GRANTED** for the following fees and costs in this court:

☒ Any or all filing fees; fees for the issuance of either a summons and subpoena; or the cost of attendance at an educational program required by A.R.S. § 25-352, fees for obtaining one certified copy of a temporary order in a domestic relations case or a final order, judgment or decree in all civil proceedings.

☐ Fees for service of process by a sheriff, marshal, constable or law enforcement agency.

☐ Fees for service by publication.

☐ Filing fees and photocopy fees for the preparation of the record on appeal.

☐ Court reporter or transcriber fees if employed by the court for the preparation of the transcript.

**IF A DEFERRAL IS GRANTED, PLEASE CHECK ONE OF THE FOLLOWING BOXES:**

☒ **NO PAYMENTS WILL BE DUE UNTIL FURTHER NOTICE.**

☐ **SCHEDULE OF PAYMENTS.**
The applicant shall pay $_____ each _____ (week, month etc.) until paid in full, beginning _____.

☐ **WAIVER IS DENIED** for all fees and costs in this case.

☐ **WAIVER IS GRANTED** for all fees and costs in this case that may be waived under A.R.S. § 12-302(H).

☐ Any or all filing fees; fees for the issuance of either a summons or subpoena; or the cost of attendance at an educational program required by A.R.S. § 25-352, fees for obtaining one certified copy of a temporary order in a domestic relations case or a final order, judgment or decree in all civil proceedings.

☐ Fees for service of process by a sheriff, marshal, constable or law enforcement agency.

☐ Fees for service by publication.

☐ Filing fees and photocopy fees for the preparation of the record on appeal.

☐ Court reporter or transcriber fees if employed by the court for the preparation of the transcript.

© Superior Court of Arizona in Maricopa County
ALL RIGHTS RESERVED
ODF
Page 2 of 3
GNF18f - 071017
Use current version

Case Number: _____

**RIGHT TO JUDICIAL REVIEW.** If the application is denied or a payment schedule is set by a special commissioner, you may request the decision be reviewed by a judicial officer. The request must be made within twenty (20) days of the day the order was mailed or delivered to you. If a schedule of payments has been established, payments shall be suspended until a decision is made after judicial review. Judicial review shall be held as soon as reasonably possible.

**NOTICE REGARDING CONSENT JUDGMENT.** Unless any of the following applies, a consent judgment may be entered against the applicant for all fees and costs that are deferred and remain unpaid thirty (30) days after entry of final judgment:

   **A.** Fees and costs are taxed to another party;

   **B.** The applicant has an established schedule of payments in effect and is current with those payments;

   **C.** The applicant filed a supplemental application for waiver or further deferral of fees and costs and a decision by the court is pending;

   **D.** In response to a supplemental application, the court orders that the fees and costs be waived or further deferred; or

   **E.** Within twenty (20) days of the date the court denies the supplemental application, the applicant either:

   1. Pays the fees and costs; or,

   2. Requests a hearing on the court's order denying further deferral or waiver. If the applicant requests a hearing, the court cannot enter the consent judgment unless a hearing is held, further deferral or waiver is denied, and payment has not been made within the time prescribed by the court.

If an appeal is taken, a consent judgment for deferred fees and costs that remain unpaid in the lower court shall not be entered until thirty (30) days after the appeals process is concluded. The procedures for notice of court fees and costs and for entry of a consent judgment continue to apply.

If a consent judgment is signed and the applicant pays the fees and costs in full, the court is required to comply with the provisions of A.R.S. § 33-964(C).

**DUTY TO REPORT CHANGE IN FINANCIAL CIRCUMSTANCES.** An applicant who is granted a deferral or waiver shall promptly notify the court of any change in financial circumstances during the pendency of the case that would affect the applicant's ability to pay court fees and costs. Any time the applicant appears before the court on this case, the court may inquire as to the applicant's financial circumstances.

**DATED:** _____ SEP 2 4 2018 _____

☐ **Judicial Officer**    ☒ **Special Commissioner**

© Superior Court of Arizona in Maricopa County
ALL RIGHTS RESERVED
ODF

Page 3 of 3

GNF18f - 071017
Use current version

```
┌─────────────────────────┐
│   Office Distribution    │
│                          │
│         ·    ▪           │
│          ·               │
│                          │
└─────────────────────────┘
```

# SUPERIOR COURT OF ARIZONA
# MARICOPA COUNTY

```
┌─────────────────────────┐
│       **FILED**          │
│       11/28/2018         │
│ by Superior Court Admin  │
│  on behalf of Clerk of the│
│     Superior Court       │
└─────────────────────────┘
```

11/24/2018

**COURT ADMINISTRATION**

Ct. Admin
Deputy

**Case Number:** CV2018-012446

**Michael Petramala**

**V.**

**City Of Scottsdale**

The Judge assigned to this action is the Honorable Joseph C Welty

## NOTICE OF INTENT TO DISMISS FOR LACK OF SERVICE

You are hereby notified that the complaint filed on 09/23/2018 is subject to dismissal pursuant to Rule 4 (i) of the Arizona Rules of Civil Procedure. The deadline for completing service is 12/21/2018. If the time for completing service has not been extended by the court and no defendants have been served by this date, the case will be dismissed without prejudice.

All documents required to be filed with the court should be electronically filed through Arizona Turbo Court at www.azturbocourt.gov.

# Superior Court of Maricopa County - integrated Court Information System
## Endorsee Party Listing
Case Number: CV2018-012446

| Party Name | Attorney Name |
|---|---|
| Michael Petramala | Pro Per |

Chris Rose, Clerk of Court
*** Electronically Filed ***
K. Vega, Deputy
12/3/2018 4:38:00 AM
Filing ID 9936463

Michael Petramala
Post Office Box 60222
Phoenix, Arizona 85082
Plaintiff Pro Se

## IN THE MARICOPA COUNTY SUPERIOR COURT

## STATE OF ARIZONA

| | |
|---|---|
| Michael Petramala, | ) )  Maricopa County Superior Court |
| Plaintiff, | )  No. CV2018-012446 |
| v. | ) )  (Telephonic Oral Argument Requested) |
| City of Scottsdale, | ) )  **CERTIFICATE OF SERVICE ON** |
| Defendant. | )  **DEFENDANT CITY OF SCOTTSDALE** |

Pursuant to Arizona Rules of Civil Procedure Rule 4.1(h)(3) the summons,

complaint, and certificate of compulsory arbitration were served upon defendant City of

Scottsdale by serving the city clerk on October 20, 2018 as follows:

Carolyn Jagger
Scottsdale City Clerk
3939 North Drinkwater Boulevard
Scottsdale, Arizona 85251.

Furthermore it was confirmed with the city clerk phone staff the above was

lodged, stamped in, and received by the city clerk.  Petramala also followed up with the

city attorney to see about settlement and/or him filing an answer but has not received any

definite response.

RESPECTFULLY SUBMITTED this 3rd day of December 2018.

By   <u>  /s/  Michael Petramala    </u>
Michael Petramala
Post Office Box 60222
Phoenix, Arizona 85082
Plaintiff Pro Se

Copies of the foregoing this day to:

Scottsdale City Attorney's Office
3939 N Drinkwater Blvd.
Scottsdale, AZ 85251
P: 480-312-2405
F: 480-312-2548
Bwashburn@scottsdaleaz.gov

# MARICOPA COUNTY SHERIFF'S OFFICE

Civil Process Section
111 South 3rd Avenue, 2nd Floor
Phoenix, Arizona 85003-2292

CHRIS DEROSE, CLERK
RECEIVED COB #2
DOCUMENT RECEIVED

**18 DEC 18  PM 3: 23**

FILED BY: *T.Bider*

Michael Petramala
vs.
City of Scottsdale

| STATE OF ARIZONA | ) | CV2018-012446 |
|---|---|---|
| | ) ss. | |
| County of Maricopa | ) | 18009905 |

I hereby certify that I received the within documents on the **3rd** day of **December A.D. 2018** at the hour of **3:52 PM,** and served the same on the **6th** day of **December** A.D. **2018** on **City of Scottsdale** being said defendant(s) named in said documents, by delivering to **Christopher Feltz, Admin Assist,** who is authorized to accept service, at **City Clerk Carolyn Jagger 3939 N Drinkwater Boulevard Scottsdale, AZ 85251** at **11:48 AM** in the County of Maricopa, a copy of said **Summons, Civil Complaint - ADA Employment Discrimination.**

**Dated this 6th day of December A.D. 2018.**

Total   $0.00

PAUL PENZONE
Maricopa County Sheriff

By _____
Deputy Jerome Hepp #S1436

B1986

Brian Rose, Clerk of Court
*** Electronically Filed ***
M. King, Deputy
12/24/2018 2:55:00 PM
Filing ID 10006245

# MARICOPA COUNTY SHERIFF'S OFFICE

Civil Process Section
111 South 3rd Avenue, 2nd Floor
Phoenix, Arizona 85003-2292

Michael Petramala
vs.
City of Scottsdale

| STATE OF ARIZONA | ) | CV2018-012446 |
|---|---|---|
| | ) ss. | |
| County of Maricopa | ) | 18009905 |

I hereby certify that I received the within documents on the **3rd** day of **December** A.D. **2018** at the hour of **3:52 PM,** and served the same on the **6th** day of **December** A.D. **2018**on **City of Scottsdale** being said defendant(s) named in said documents, by delivering to **Christopher Feltz, Admin Assist,** who is authorized to accept service, at **City Clerk Carolyn Jagger 3939 N Drinkwater Boulevard Scottsdale, AZ 85251** at **11:48 AM** in the County of Maricopa, a copy of said **Summons, Civil Complaint - ADA Employment Discrimination.**

**Dated this 6th day of December A.D. 2018.**

Total   $0.00

PAUL PENZONE
Maricopa County Sheriff

By _____
Deputy Jerome Hepp #S1436

B1986

Smith-Rose, Clerk of Court
*** Electronically Filed ***
K. Vega, Deputy
12/26/2018 9:11:00 AM
Filing ID 10007085

1  **SCOTTSDALE CITY ATTORNEY'S OFFICE**
   3939 North Drinkwater Boulevard
2  Scottsdale, Arizona 85251
   (480) 312-2405 (T)
3  Lori S. Davis (SBN: 027875)
   legal@scottsdaleaz.gov
4
   **Attorneys for Defendant**
5

6
                  **IN THE SUPERIOR COURT OF THE STATE OF ARIZONA**
7
                  **IN AND FOR THE COUNTY OF MARICOPA**
8

9  Michael Petramala;                        Case No.: CV2018-012446

          Plaintiff,                         **MOTION TO DISMISS**
10 vs.

11 City of Scottsdale;                       (Honorable Joseph Welty)

12        Defendants.

13

14         Comes now Defendant City of Scottsdale, ("City Defendant") by counsel, and pursuant

15 to Ariz. R. Civ. P. 12(b)(6) and Administrative Order No. 2005-184, hereby moves the Court

16 to dismiss the Complaint.

17     1.  Plaintiff Petramala is a vexatious litigant.  At last count, he has filed over seventy-

18         two lawsuits and appeals.  He has also been found to be "criminal[ly] incompetent"

19         by Order entered September 14, 2004 in CR2004-019118.

20     2.  Administrative Order No. 2005-184 declares Plaintiff a vexatious litigant and

21         prohibits Plaintiff Petramala from filing any lawsuit in Maricopa County without

obtaining prior permission from the Court. *See* Administrative Order dated 12/8/2005 (attached hereto as **Exhibit 1**).

3. Plaintiff Petramala disregarded Administrative Order 2005-184 and did not seek prior permission before filing the instant lawsuit.

4. The Clerk of Court also failed to identify and deny the filing of Plaintiff Petramala's Complaint, per the terms of the Administrative Order.

5. This Court should dismiss this lawsuit because Plaintiff is a vexatious litigant who has failed to comply with the dictates of Administrative Order 2005-184.

Accordingly, City Defendants pray this Honorable Court dismisses Plaintiff's Complaint.

DATED this 26th day of December, 2018.

**SCOTTSDALE CITY ATTORNEY'S OFFICE**

By:   /s/ Lori S. Davis
         Lori S. Davis, Senior Assistant City Attorney
         3939 North Drinkwater Boulevard
         Scottsdale, Arizona 85251
         Attorney for Defendant

## CERTIFICATE OF SERVICE

**ORIGINAL** of the foregoing
e-filed this 26th day of December, 2018 with:

AZ Turbo Court
Clerk of Superior Court

**COPY** of the foregoing mailed
this 26th day of December, 2018 to:

Michael Petramala
P.O. Box 60222
Phoenix, AZ 85082
Plaintiff

By: ____/s/ Brittany Leonard_____
Employee of the Scottsdale City
Attorney's Office

17053776v1                                3

# EXHIBIT 1

**IN THE SUPERIOR COURT OF THE STATE OF ARIZONA
IN AND FOR THE COUNTY OF MARICOPA**

IN THE MATTER OF PROHIBITING            )
MICHAEL PETRAMALA FROM FILING ANY   )
LAWSUIT IN MARICOPA COUNTY WITHOUT )    ADMINISTRATIVE ORDER
OBTAINING PRIOR PERMISSION FROM THE)    NO. 2005-184
COURT AND CONSOLIDATING DEFERRAL    )
FEE REQUESTS                                          )
_____)

        This matter was referred to me by the Honorable Judge Margaret Downie following her minute entry in Case number LC2005-000863-001DT dated November 21, 2005 in which the Judge took no action on the pending motion for reasons stated in the minute entry and attached hereto.  Upon receipt of this referral, the court reviewed further case filings in which plaintiff is or has been involved with.

        Upon full review of the record, the court finds that the plaintiff has been a named party in at least 27 civil justice court cases, mostly as plaintiff, since 1996.   In addition, the plaintiff is a named party in nine criminal and traffic cases during that same period. The overwhelming majority of the civil cases were filed in 2004 and 2005.

        A review of the case dispositions indicate that the overwhelming majority of cases ended in a decision of dismissal, abandonment, or in a judgment for the other party.  Plaintiff frequently failed to comply with court orders and failed to pay deferred fees to the court.  Actions typically ended in a dismissal for failure to state a claim upon which relief can be granted only after volumes of motions were filed on the court. Plaintiff filed appeals which were abandoned and sued several parties multiple times. Plaintiff further routinely requested permission to appear telephonically and when denied failed to appear in court.

        Additionally, it appears that on September 14, 2004 that plaintiff was declared unable to understand the nature of proceedings in a criminal case filed against him and was further found unlikely to be restored to competency in the statutory timeframe for the crime then charged (entry attached).  This suggests that plaintiff may have difficulty in understanding the nature of the litigation that he is pursuing throughout the county court system.

        In determining whether the court should issue orders to curtail wasteful litigation and motion practice and in reviewing the plaintiff's request for a deferral of fees as well as the plaintiff's prior litigation history, the court relies on its inherent authority to screen cases to insure the orderly administration of justice.  A court's inherent authority "may be defined as such powers as are necessary to the ordinary and efficient exercise of jurisdiction." *State v. Superior Court,* 39 Ariz. 242, 247-48, 5 P.2nd 192, 194 (1931).

As the court stated in *Acker v. CSO Chevira*, 188 Ariz. 252, 934 P.2d 816 (1997), a court's inherent authority is largely unwritten; appellate affirmation of an exercise of that authority ordinarily grounded on trial court findings and conclusions which explain its actions. In *Jones v. Warden of Stateville Correctional Center*, 918 F.Supp. 1142, 1153 and 1156 (N.D.Ill.1995), the federal court held that the inmate's access to the courts could be severely curtailed because he had proven himself to be a "recreational litigant" who "repeatedly and flagrantly abused the judicial process by inundating the courts with frivolous and repetitive lawsuits."

Given the plaintiff's propensity to file lawsuits with no discernable outcome, and given the plainly frivolous nature of the complaints and the conduct of plaintiff in pursuing litigation, the court does find the plaintiff to be a vexatious litigant.

In doing so, the court must tailor its Order only so much as needed to curtail plaintiff's inappropriate conduct. Based on the court's review of the record, the court believes that the only order that will adequately address plaintiff's litigiousness is an Order prohibiting plaintiff from filing any lawsuit in Maricopa County without obtaining permission from either the Presiding Judge of the County or its Associate Presiding Judge for Limited Jurisdiction Courts.

Any motion for leave to file shall be captioned, "Application Pursuant to Court Order Seeking Leave to File." Plaintiff must either cite this Order in his application, or attach as an exhibit a copy of this Order. In seeking leave to file, plaintiff is required to certify under penalty of perjury that the claim or claims he wishes to present are new claims never before raised and disposed of by any other court, within or outside Maricopa County. He would also need to certify that the claims are neither frivolous nor made in bad faith.

This Order does not prohibit plaintiff from responding to any litigation in which he is a named defendant.

In accordance with the foregoing,

IT IS ORDERED that plaintiff Michael Petramala may not file an action in any court in Maricopa County without leave of the Court. Any motion for leave to file shall be captioned, "Application Pursuant to Court Order Seeking Leave to File." Plaintiff must either cite this Order in his application, or attach as an exhibit a copy of this Order. In seeking leave to file, plaintiff is required to certify under penalty of perjury that the claim or claims he wishes to present are new claims never before raised and disposed of by any other court, within or outside Maricopa County. He would also need to certify that the claims are neither frivolous nor made in bad faith;

IT IS ORDERED that the plaintiff shall include tax returns for the prior two years as well as the most recent wage statements from work should he file for a deferral of fees for any case he presents for a pre-filing review;

IT IS ORDERED that the clerk of the court and justice court personnel shall not accept for filing any further complaints by Michael Petramala until either the Presiding Judge of the County or its Associate Presiding Judge for Limited Jurisdiction Courts approve after a pre-filing review as outlined above; and

IT IS FURTHER ORDERED that plaintiff may petition this court for a hearing on this Order and may present information at that hearing to dispute the findings herein.

Dated this 8th day of December, 2005.

Barbara R. Mundell
Presiding Judge

Original:     Clerk of the Superior Court

Copies:       Hon. Gerald Porter, Associate Presiding Judge for
              Limited Jurisdiction Courts
              Hon. Anna Baca, Presiding Civil Judge
              Hon. Margaret Downie, Presiding Judge for Lower Court Appeals
              Mitch Michkowski, Civil Court Administrator
              Marcus Reinkensmeyer, Trial Courts Administrator
              Brian D. Karth, Limited Jurisdiction Courts Administrator
              Maricopa County Justices of the Peace
              Michael Petramala

** NOTE:  File exhibits defined in this Administrative Order have been sent only to Plaintiff Michael Petramala.  Due to the voluminous nature of the exhibits, any other party requesting a copy of the exhibits may review the case file.

Bruce Rose, Clerk of Court
*** Electronically Filed ***
K. Vega, Deputy
12/26/2018 2:14:00 PM
Filing ID 10008301

Michael Petramala
Post Office Box 60222
Phoenix, Arizona 85082
Plaintiff Pro Se

## IN THE MARICOPA COUNTY SUPERIOR COURT

## STATE OF ARIZONA

|  |  |
|---|---|
| Michael Petramala, | ) |
| | ) |
| Plaintiff, | ) Maricopa County Superior Court |
| | ) No. CV2018-012446 |
| v. | ) |
| | ) (Telephonic Oral Argument Requested) |
| City of Scottsdale, | ) |
| | ) **PLAINTIFF'S RESPONSE TO** |
| Defendant. | ) **DEFENDANT'S MOTION TO DISMISS** |
| | ) |
| | ) |
| | ) |

Plaintiff replies to Scottsdale's motion to dismiss and opposes it for the following reasons.

First, Petramala was granted prefiling review on this case by the presiding judge dated 9/13/2018 and thus complies with the administrative order 2005-184 and that argument raised by Scottsdale is without merit.  Moreover, the vexatious litigation alleged is part of a learning process where mistakes are made during litigation at the initial phase of a pro se litigants career.  Many great people in various fields are vexatious.  For an analogy, the famous basketball player Michael Jordan one of the greatest vexatious basketball players of all time stated, "I've missed more than 9000 shots in my career. I've lost almost 300 games. 26 times, I've been trusted to take the game

winning shot and missed."  Here, Petramala is legally correct despite past performance issues in the pro se litigation arena.

With regards to being declared criminally incompetent this occurred due to Scottsdale filing a vexatious criminal case, which was dismissed against Petramala.  The case was filed without probable cause, and Scottsdale engaged in gross negligence during its investigation leading to a false charge.  Moreover, the Goldwater Institute recently determined that Scottsdale was using its criminal justice prosecutions in a vexatious manner by focusing on money instead of public safety.  Here, Scottsdale initially $500 against Petramala to not enter him on NICS yet dismissed the case by way of Rule 11 Arizona Rules of Criminal Procedure when Petramala could not afford to pay the $500 plea bargain fine so Scottsdale vexatiously entered Petramala on NICS instead due to his indigence.  In end, the initial misdemeanor filing by Scottsdale was vexatious by Scottsdale and somehow raising it as a defense in an ADA employment matter fails because that argument has no merit because the ADA employment matter seeks to earn monies to pay NICS removal costs occasioned by the underlying vexatious criminal prosecution initiated by Scottsdale without factual or legal merit.

RESPECTFULLY SUBMITTED this 26th day of December 2018.

By   _/s/  Michael Petramala_____
Michael Petramala
Post Office Box 60222
Phoenix, Arizona 85082

                                         Plaintiff Pro Se

Copies of the foregoing this day to:

Scottsdale City Attorney's Office
Lori S. Davis
3939 N Drinkwater Blvd.
Scottsdale, AZ 85251
P: 480-312-2405
F: 480-312-2548
Bwashburn@scottsdaleaz.gov

COPY

Chris DeRose, Clerk of Court
*** Filed ***
09/14/2018 at 8:00 a.m.

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

AO 2005-184                                          09/13/2018

                                          CLERK OF THE COURT
HONORABLE JANET E. BARTON                      A. Gonzalez
                                                Deputy

.

IN THE MATTER OF PROHIBITING           MICHAEL PETRAMALA
MICHAEL PETRAMALA FROM FILING          PO BOX 60222
ANY LAWSUIT IN MARICOPA COUNTY         PHOENIX  AZ 85082
WITHOUT OBTAINING PRIOR PERMISSION
FROM THE COURT AND CONSOLIDATING
FEE REQUESTS


                                          JUDGE GATES


                              RULING


        On September 10, 2018, the Court received Mr. Petramala's Motion for Leave to File ADA
Employment Case Against Defendant City of Scottsdale.  Pursuant to that request, the Court
hereby authorizes Mr. Petramala to file an ADA employment case against the City of Scottsdale
raising the same claims he raised in his Notice of Claim dated July 24, 2018.  The Court's
authorization to file this lawsuit is not intended and should not be construed as any opinion by this
Court regarding the merits of such a case.


Docket Code 019                     Form D000B                          Page 1

# CITY COURT:
## MONEY, PRESSURE AND POLITICS MAKE IT TOUGH TO BEAT THE RAP



By Mark Flatten
**National Investigative Reporter**
**Goldwater Institute**

The red and blue lights are flashing in your rear-view mirror as you pull to the side of the road, certain you did not do anything wrong and wondering why you are being stopped.

The police officer's first question is likely to be whether you know why he pulled you over. When you stare at him with a puzzled look and say no, he will explain and ask you for your driver's license, registration, and proof of insurance.

If your paperwork is not in order, you will likely face criminal charges and possible arrest.

If it is, the encounter will most likely end with a traffic ticket. Maybe two or three. Each will cost you hundreds of dollars in fines, fees, and surcharges, in addition to driving up your insurance rates because any traffic violations add demerits to your license.

You could hire a lawyer and challenge the ticket in court. But the lawyer will cost you far more than just paying the ticket.

Besides, if you do challenge the ticket, it may come down to your word against that of the police officer, a city employee.

Your case will be heard in city court in front of a city judge.

That judge is hired and retained by the city council.

That city council is responsible for raising money to continue paying the salaries of city employees, including their own, the judge's and the police officer's.

If you beat the ticket, the city gets no money. If you are found responsible, about half of the money you pay in fines, fees, and surcharges will go directly into the city's coffers. The rest will be scattered to a variety of special accounts used to pay for things as varied as DNA testing and the state's clean elections fund financing political candidates.

Given all that, do you really think you can get a fair hearing?

That question is causing much soul searching in courtrooms and legislatures nationally, and has been the subject of a half-dozen reform efforts in Arizona since the 1950s, all without success.

Arizona judges at all other levels—whether members of the justice, superior, or appeals courts—answer directly to the people through elections. Only in city court are judges completely beholden to the political branch of government: the city council, which not only appoints and retains them, but can fire them at any time if council members determine there is sufficient cause.

More than 20 years ago, an Arizona Supreme Court justice said the nearly unchecked power of city councils to hire and fire judges "fastens the lid on the coffin of judicial independence." His concerns were rejected by his colleagues on the bench and written in dissent, as the court upheld the council's power to fire a judge for cause at any time.

Nothing has changed since then.

The biggest danger is that outside political pressure can skew the independence of the judges and thereby influence their decisions.

That pressure may be to raise more money for the city, which means judges might be more likely to convict. It may be to give preferential treatment to influential city insiders. Or it may be to sign off on questionable city policies, such as what constitutes legal notification of a photo-enforcement ticket.



"The municipal court does not act as a neutral arbiter of the law or a check on unlawful police conduct. Instead, the court primarily uses its judicial authority as the means to compel the payment of fines and fees that advance the City's financial interests."

*- U.S. Department of Justice Ferguson report*

What that means to you is that when you go to city court, reaching a fair and impartial decision in your case may not be all that's on the judge's mind.

"Judges may perceive pressure to rule in particular ways, and even if they don't feel the pressure, the public may think it exists," Rebecca White Berch, former chief justice of the Arizona Supreme Court, said in an email interview with the Goldwater Institute. "And perception is often as important as reality. Our justice system depends on citizens' faith in the independence of judges, so even the perception of undue or unseemly pressure can destroy confidence in the judicial system.

"Judges should not seek to please any particular group or litigant with his/her rulings; judges must adhere to the law," said Berch, who retired from the court in 2015. "This requirement is so strong that judges must rule according to law even when doing so is not popular or may cost them their jobs."

City judges being co-opted by political forces is a long-simmering issue, both in Arizona and nationally. Seventeen states have eliminated municipal courts. Of the rest, about half have their judges elected, according to data from the National Center for State Courts. Arizona is one of about a dozen states that put the appointment of judges solely in the hands of the mayor and city council, and one of only about seven states that allow the city council, rather than voters, to determine whether a judge will be reappointed at the end of the first term in office. The figures are not precise because some states allow appointment and retention mechanisms to differ between cities.

Technically, Arizona law allows cities to determine the method of appointment and length of terms for judges. Yuma is the only city that allows its judges to be elected by the people. In every other Arizona city, judges are appointed by the councils.

The danger of political pressure skewing city court decisions is not an esoteric one. Its consequences were exposed in stark detail by the U.S. Department of Justice in Ferguson, Missouri, after the police shooting of Michael Brown in August 2014.

The DOJ did two investigations. The first produced a highly publicized report clearing the police officer of wrongdoing. The second and less well-known investigation looked into the overall police and court practices of Ferguson.

The DOJ documented pressure from city officials on city judges to continually increase the flow of money. This pressure to raise revenue led to practices such as tacking abusive and potentially illegal fees onto fines for minor infractions, and using arrest warrants and driver's license suspensions primarily as tools to compel payment of fines rather than to protect the public or mete out justice.

"Ferguson has allowed its focus on revenue generation to fundamentally compromise the role of Ferguson's municipal court," the Justice Department concluded in its final report, issued in March 2015. "The municipal court does not act as a neutral arbiter of the law or a check on unlawful police conduct. Instead, the court primarily uses its judicial authority as the means to compel the payment of fines and fees that advance the City's financial interests. This has led to court practices that violate the Fourteenth Amendment's due process and equal protection requirements."

Appointment and retention of judges in Ferguson is done by the city council, just as it is in Arizona.

# SUBTLE INFLUENCE

Despite the conclusion that raising money was a prime objective of the Ferguson court, the DOJ report does not cite a single instance in which city officials either directly told a judge how to rule in a particular case or generally asked a judge to boost revenue through more convictions.

The pressure was more subtle than that.

It was typically couched in terms of meeting revenue and budget projections, and using aggressive collection techniques to ensure defendants who owed money paid on time.

It's not always clear what is allowed and what is inappropriate in conversations between municipal judges and other city officials. Clearly, city council members should not tell judges how to rule on cases, according to interviews with judges and other city officials.

But presiding municipal court judges also have administrative responsibilities over budgets and personnel, just like other city department heads.

Municipal judges are expected to cooperate with city budget planners to develop revenue projections for the coming year, to operate efficiently within the spending limits set by the council, and to adhere to city budget and personnel rules as long as they do not impede the ability to fulfill their legal duties.

So talks about revenue and expenses of the court might be inappropriate pressure on the judge, or simply good budget planning.

"Interference by local political office holders with locally appointed judges may be discrete and difficult to identify," the national Conference of State Court Administrators warned in a report issued in 2014.

Judges can refuse to follow orders they believe compromise their independence.

City councils can refuse to reappoint those judges without giving a reason.

The Goldwater Institute reviewed personnel evaluations of presiding judges in several cities. None tied the judge's performance to meeting revenue goals. Instead, the official reviews included more generic categories such as integrity, accountability, courtesy, knowledge, and "contributing to team success."

Judges and other city officials are not likely to admit publicly if they are inappropriately pressured to raise revenue, much less put it in writing.

Rick Schwermer, state courts administrator in Utah, said that since he joined the office in 1990 he regularly received confidential complaints from city judges saying they were pressured to raise more money.

"Some of our judges said to me 'my mayor told me I got to get the revenue up,'" Schwermer said. "That's not something a judge is ever going to say in public, but they were able to say that to me."

Largely because of those complaints, in 2008 Utah revamped its method of appointing and retaining municipal court judges so they now answer to voters, not city councils.

Pressure to raise revenue and the focus on financial compliance by defendants are recurring concerns of city judges and court administrators, according to a report published by the National Center for State Courts. The conclusion is based on confidential surveys and discussions at court management conferences conducted between 2003 and 2010, including one in Phoenix. Other recurring concerns include judicial independence, the "role and purpose" of the courts, and "collaboration and tensions with justice partners."

All of the municipal judges interviewed by the Goldwater Institute said they have never been told directly by council members or other city officials that they need to increase revenue, either through more convictions or more aggressive collection techniques. They do acknowledge that they discuss revenue projections and court spending as part of their administrative duties, adding those conversations are appropriate and necessary to plan budgets.

"For the most part, the budget parameters as far as spending is in their (city council's) ballpark," said Judge Joseph Olcavage, presiding judge of the Scottsdale Municipal Court. "As far as revenue, it would be totally inappropriate for them to say you need to bring in so much money because that goes into sentencing and applying fines. That has to be based on fairness . . . As far as revenue goes, that's in our ballpark entirely, and they should have no input into that."

> **"Some of our judges said to me 'my mayor told me I've got to get the revenue up.' That's not something a judge is ever going to say in public, but they were able to say that to me."**
>
> *- Rick Schwermer, Utah court administrator*

# MONEY AND POWERS

If you ever wind up in court, chances are it will be in city court. More than half of all cases in Arizona are handled in city court, according to the Arizona Administrative Office of the Courts, the administrative wing of the state's judiciary, which operates under the Supreme Court. That means city courts in Arizona deal with about 1 million cases per year.

Municipal courts are also the biggest moneymakers in the Arizona judicial system. They raise almost half of



all the money generated by the court system in Arizona, about <u>$167 million in 2016</u>. Yet they account for only about 13 percent of the cost of running the state's courts.

Arizona law requires all cities to have <u>municipal courts</u>. There are 82 in Arizona, depending on how they are counted. Cities can contract with each other or with justice of the peace courts to provide judicial services if they are within the same county.

Municipal judges do not have to be lawyers in Arizona. Each city sets its own minimum qualifications.

City court judges have <u>criminal jurisdiction</u> over misdemeanor crimes and petty offenses committed within town limits. That includes misdemeanor traffic offenses such as driving under the influence of alcohol (DUI), reckless driving, and leaving the scene of an accident.

Municipal courts also have primary jurisdiction over violations of city ordinances, which are also frequently classified as criminal misdemeanors. Those can range from prostitution and obstructing a police officer to seemingly minor offenses such as having <u>excessively tall weeds</u> in your yard, littering, <u>failing to return a library book</u>, and violating <u>city smoking ordinances</u>, all of which are considered criminal infractions in some municipal codes across Arizona.

Last year, 11 people were booked into Maricopa County jail for violating Mesa's smoking ordinance, a criminal offense under the city code, according to records from the sheriff's office.

Spitting on the sidewalk is a <u>criminal misdemeanor</u> in Mesa, and last year that was among the charges one man faced when he was booked into jail after threatening police.

In Peoria, two people were jailed for the crime of having weeds taller than six inches on their property. Others were jailed for having disabled vehicles parked on their property, <u>also a criminal offense in Peoria</u>.

Municipal judges can impose sentences of up to six months in jail and $2,500 in fines for criminal misdemeanors, including local ordinance violations. If a person misses a court date, or <u>even a single payment</u> on a misdemeanor fine, the judge <u>can issue an arrest warrant</u>.

Violating minor ordinances that wind up in city courts also can have severe consequences beyond just the fines and jail time a judge might impose. Courts have ruled that police <u>can arrest and search</u> people stopped for even minor ordinance violations, and prosecute them on more serious felony charges if illegal items such as drugs are found as a result.

A misdemeanor conviction in municipal court means a person will have a criminal record, which can make it difficult to obtain a job, an occupational license, a teaching certificate, or a student loan. A criminal conviction in city court can jeopardize a person's immigration status. It can even make it illegal for the person to <u>possess a gun</u> if the case involves domestic violence or orders of protection.

# CHARGES AND SURCHARGES

But the real moneymaker for Arizona city courts is civil traffic violations, things like routine tickets for speeding, running red lights, and making illegal turns.

In 2016, 623,797 <u>civil traffic cases</u> were filed in municipal courts statewide, which accounted for about two-thirds of all new cases. Another 79,070 parking cases went through city courts.

State reports do not specify how much money is raised through traffic and parking tickets as opposed to other charges such as DUIs and misdemeanors. Nor do they show how much of the money raised by individual courts is retained by the cities. Much of the money they collect is forwarded to <u>dozens of special funds</u> set up in state law and financed by court-related penalties.

What the state reports do show is that municipal courts <u>raised $166.7 million</u> in 2016.

Of the total, about $69.4 million is from the fines themselves. The cities keep most of that.

Court fees and other charges layered on by the state and cities added $53 million in revenue.

The state also imposes a surcharge on all traffic and parking tickets, misdemeanor convictions, and pretty much every other type of case that goes through city courts. That raised about $44.3 million in 2016.

So a traffic violation that carries a base fine of $124 will cost you about $342 when all of the fees and surcharges are tacked on, according to <u>calculations from the state courts</u>.

For a simple DUI conviction, a base fine of $250 will reach a total of $1,671 by the time additional assessments, fees, and surcharges are added in.

Roughly half of the total amount raised by municipal courts goes to the city. The exact amount retained by each city varies by jurisdiction and by charge. Cities can get another piece of the state surcharge money through grants for technology and training.

The money does not go directly to the court. Rather it is paid into the city's general fund, where it goes to support general city operations. Court funding is set through the normal city budget process and is financed almost exclusively through the general fund of the city.

As with revenue figures, there is scant information about conviction rates in municipal courts.

The state office of the courts was unable to provide any figures on conviction rates in individual city courts. It did conduct a study examining data from 2014 that found the <u>overall conviction rate</u> for civil traffic violations in justice and municipal courts across Arizona is 83 percent. That includes about 22 percent of those

cited who opted to plead responsible—the civil traffic equivalent of guilty—in return for being allowed to take a defensive driving class and have the ticket wiped off their driving record.

Defensive driving school <u>is only available</u> for people who plead responsible. It is not an option for those who want to contest the charges. That is a powerful inducement to admit guilt. Upon completion of the course, there will be no record of the citation on the driver's record and no points against a person's driver's license. Points for traffic convictions spike insurance rates and can lead to revocation of a driver's license.

Defensive driving is only available for one charge, and only to drivers who have not taken the course for at least a year.

The overall conviction rate for speeding tickets, the most common traffic violation, is 87.8 percent.

The Goldwater Institute observed several days of hearings in different courts throughout Maricopa County recently. In traffic court, defendants frequently have multiple citations and agree to plead responsible to one in return for having other charges dropped. This was particularly common when defensive driving school was available.

# REVENUE PRESSURE

City courts in Arizona often tout their revenue-raising ability on their websites, in annual reports on the courts, or in budget documents.

"The Court has the highest case-to-personnel ratio and second highest revenue-to-expenditure ratio of the largest Municipal Courts in Maricopa County," reads the <u>2016 annual report</u> from Tempe city court. It adds that in its court, "for every $1 expended on Court operations, the Court collected $2.56 in fines and fees in FY [fiscal year] 14/15."

Paradise Valley similarly boasted the <u>revenue-raising ability</u> of its municipal court, noting in a budget document:

"For every $1 expended on court operations [the court] collected $3.08 in fines, fees and State surcharges," the budget says, noting the average return for all

Arizona municipal courts is $1.83 in revenue for every dollar spent.

Among the goals for the Page municipal court cited in budget documents is to "continue to maintain current funding levels with existing resources."

Pressure on judges to raise revenue plays out in subtle ways, said Joseph St. Louis, a Tucson attorney who has practiced in front of municipal courts for about 30 years and is certified by the American Bar Association and the National College for DUI Defense as a specialist in defending criminal and DUI cases. The pressure may manifest as rulings in individual cases that don't make sense but which taken as a group consistently go against the defendants. It could be consistently siding with the police version of what happened.

Outside influence is particularly damaging in civil traffic cases, where defendants are rarely represented by an attorney and the standard of proof is "preponderance of the evidence," meaning the judge simply has to find that it is more likely than not—to any degree—that the defendant is guilty, he said.

"You certainly see decisions that result in convictions and fines being imposed that have the appearance of having been made in order to engineer that result, in order to make sure that there has been a conviction and that monies have been paid," said St. Louis, who is also past president of the Arizona Attorneys for Criminal Justice. "In my experience judges are very aware of how much revenue they are bringing in, where their caseload is at, how often people are being convicted or not convicted in their courtrooms.

"The concern ought to be making sure the person has their day in court, gets a fair shake and that the right result is obtained, and not a concern for how much money is being generated. That shouldn't even be a factor. If you've got judges that are concerned with the amount of revenue that's coming in versus being concerned with reaching the right result in the case, that's a fatal error."

> **"In my experience judges are very aware of how much revenue they are bringing in, where their caseload is at, how often people are being convicted or not convicted in their courtrooms."**
>
> **- Joseph St. Louis, Tucson attorney**

# DANGEROUS DEMANDS

Even the Arizona Office of the Courts is cognizant that there is at least a danger that cities can lean on their courts to be moneymakers, especially in light of the Justice Department's findings in Ferguson. Fair Justice for All, a special task force created last year by Scott Bales, chief justice of the Arizona Supreme Court, warned that:

"Courts are not revenue-generating centers. While courts do collect monies in the form of restitution, fines, and fees, the purpose of courts is to administer justice—not produce revenue for governmental use."

The Justice for All committee examined the breakdown of the judicial system in Ferguson and developed reforms to prevent the same things from happening in Arizona cities. Its recommendations focused primarily on alternatives to punitive debt collection tools, such as arrest warrants, rather than revenue-raising pressures on city judges.

But even before Ferguson and the Justice for All task force, guidance from the Arizona office of the courts had long warned cities against exerting pressure on judges to do anything but fairly dispense justice.

"Interference that impedes the court from carrying out the impartial administration of justice violates the distribution of powers provision of the Constitution of the State of Arizona, and the fundamental principles of our constitutional form of government," the office warns in guidance aimed as much at city councils as the judges themselves.

Don Taylor, chief presiding judge in Phoenix Municipal Court, said he understands why some people perceive the primary role of city courts is to make money. Jail is not an option for civil traffic cases, and is not appropriate for most of the misdemeanor cases that wind up in city court, said Taylor, a member of the Justice for All task force.

That means the only appropriate punishment in most of the cases heard in city court is to assess a fine, he said. That fuels the perception that it's all about money.

But the courts in Phoenix and most other Arizona cities lose money, even though a small number do turn a profit, Taylor said, an assessment backed by a review of city budgets. In the 2017 fiscal year, Phoenix anticipates raising about $15.2 million from court fines and spending $28.1 million from its general fund to pay for the courts.

Court fines also account for a miniscule part of overall city budgets. In Phoenix, the fines account for about 1.4 percent of the total city general fund, which finances day-to-day operations. In Ferguson, court fines generated about a quarter of total city general fund revenues in 2015, according to the Justice Department.

"The court is not about making money. That's a byproduct of what we do, which is hold people responsible," Taylor said. "You've got the people who believe it's all a revenue-generating system. If that's the truth, it's the worst business model ever designed. The court is going to collect far less in general fund revenues than it costs to fund the court out of the city's general fund. So it's a huge money-losing proposition. If that's the case, we'd do better economically shutting it all down."

Cities are required to have municipal courts by law.

Taylor said he has never been pressured to raise revenue. Even if he was, there are not many revenue-raising options for judges since cases are handled on an individual basis, and the court has no control over how many cases are filed.

"Even if those sort of inappropriate conversations were going on, there's nothing we could do," he said.

# TURNING A PROFIT

There are two ways to gauge whether a city court is profitable.

One way is to look at the total amount of money generated by each court, including fines, fees, and surcharges. By that measure, 21 city courts cost more money to operate than they raise, almost all of which are in small communities like Hayden, Safford, and Somerton.

But cities keep only about half of that money. So that may not be the best way to gauge profitability, even though it is the figure typically cited in budget documents to tout the efficiency of individual courts.

There is a line buried in city budgets called "fines and forfeits," which represents court-generated revenues paid into the general fund that the city gets to keep. By that measure, most cities either lose money or break even, even when additional state funds are included.

There are exceptions.

Paradise Valley has the most lucrative court in Arizona, based on budget projections for the 2017 fiscal year. The municipal court will raise about $3.4 million for the town while costing about $705,290 to operate. Judges in Paradise Valley are all volunteers, which helps keep costs down.

The town also raises an inordinate amount of money through the court fees it tacks on to the penalties, according to state revenue figures from 2016. In most other cities, court-imposed fees account for about a third or less of the total amount raised through fines, surcharges, and fees. In Paradise Valley, fees account for about two-thirds of the total revenue raised.

Many of the court fees are set locally and are retained by the city.

Court-generated revenues—the part that the town gets to keep—account for about 13 percent of all revenue generated for the Paradise Valley general fund. That is far more than other Arizona cities, which typically raise less than 5 percent of their general fund revenue through the courts, but still less than Ferguson.

Volunteer judges are a big reason the cost of running the town's court is so low, said Tyrrell Taber, presiding judge of the Paradise Valley court. The city also has invested in technology and other improvements that increase efficiency and customer service, he said.

Taber, who serves on a two-year term, said he has never been pressured to raise revenue by the mayor, council, or any other city official, and would not tolerate it if he ever was.

As to the language in town budgets touting the court's revenue-raising prowess, Taber said he is required to report that information to the state. Noting it in budget documents is "a statement of fact."

"It's not something that we would try to hide or disguise in any way. It is what it is," he said. "The problem you have with any municipal court is the percep-

tion is that every municipal court is there for purposes of trying to make money. The answer to that is not ours. That's not our goal. That's not our mission."

Tempe also runs a profitable court, with projections showing it will raise about $8.4 million from fines and forfeitures in 2017 while costing the city about $4.4 million from its general fund.

Other cities showing positive net revenues from their courts include Scottsdale, Gilbert, and Tucson.

One Arizona community did make Ferguson-level profits from its court-related operations in recent years. Star Valley, a small town on Highway 260 near Payson, raised $890,000 through photo radar traffic tickets in 2016. That was about 47 percent of the town's total general fund income.

Star Valley uses the local justice of the peace to adjudicate its traffic tickets through an agreement with Gila County.

The legislature put an end to the practice last year when it banned photo radar on state highways. As a result, the town anticipates raising about $96,000 through traffic citations in 2017.

# FAILURES IN FERGUSON

The national hand-wringing about the role of municipal courts and whether they are too vulnerable to political pressure was triggered by the Justice Department's findings in Ferguson. Beyond the bottom-line conclusion that the judge in Ferguson had allowed his court to become a revenue-raising tool of the city, the DOJ was critical of practices such as issuing arrest warrants and suspending driver's licenses to compel payment of fines.

Similar practices are routinely used in Arizona to compel payment.

The Ferguson judge and his staff, as well as the police chief, were repeatedly urged to take steps to increase revenue to meet budget projections, according to DOJ. The police chief did his part by implementing a ticket quota system, whereby police officers' performance evaluations were tied to the number of citations they issued and the amount of revenue they generated.

Those tickets wound up in city court, where the judge did not question the practice, according to DOJ.

The judge in Ferguson is appointed and retained by the city council, just as city judges are in Arizona and about 10 other states.

The Arizona Supreme Court has ruled that the council can choose not to retain a judge for any reason. It only needs cause to fire a judge if it occurs outside the reappointment process, the court said in a 1994 decision.

The justices in that case did not specify what would be sufficient cause to fire a judge midterm. Cities in Arizona have fired municipal judges for such things as sexual harassment of attorneys and conflicts of interest involving individual defendants.

Judges in Arizona actually have more power than they do in Ferguson. In Missouri, the city judge can put people in jail for up to three months and assess up to $1,000 in fines. In Arizona, city judges can jail someone for six months and impose $2,500 in fines.

Other than that, their duties are largely the same.

The city courts in Ferguson and those in Arizona also are overseen by higher courts, which is supposed to be a check on abuse. In Ferguson, oversight is the responsibility of county circuit court under rules promulgated by the Missouri Supreme Court. In Arizona, similar oversight responsibility exists through the county courts and the state supreme court.

# JUDICIAL PRODUCTIVITY

The Arizona Supreme Court has stripped two city judges of their duties for misconduct since 1995, according to a list from the state Commission on Judicial Conduct. That happened most recently in 2014, when it removed Judge Scott Sulley from his dual roles as municipal court judge in the city of Maricopa and as justice of the peace in Pinal County.

Maricopa is in Pinal County. Sulley had been the magistrate judge there since the city was incorporated in 2003.

In November 2013, the state Office of the Courts determined money that people had paid to Sulley's

courts to attend defensive driving school was not being deposited into the proper accounts. Audits were ordered, which uncovered gross financial mismanagement in both the city and justice courts. Payments of court fines were not properly recorded and deposited. Final dispositions, some years old, were not properly recorded in case files. Restitution payments were not forwarded to victims. Surcharge money that should have gone to the state was not paid.

Auditors discovered <u>more than $112,000</u> in unsecured cash, checks, and money orders dating back several months scattered in the court clerk's office. Case files were stacked on tables, in hallways, and in a holding cell.

The disarray prompted the Arizona Supreme Court to <u>issue an order</u> assigning administrative control of both courts to the presiding Pinal County Superior Court judge.

Subsequent investigation uncovered practices that rivaled those in Ferguson.

Defendants on time payment plans were required to <u>regularly appear in court</u>, even if they were up to date on their payments. When one defendant showed up a day late, Sulley <u>insisted on issuing</u> a warrant for failure to appear.

One man continued to have his wages garnished even after he'd paid all his court fines because the record-keeping was so sloppy.

Because of the lack of accurate payment records, the Pinal County presiding judge ordered Sulley to stop issuing arrest warrants for missed payments until the accounts could be reconciled. Sulley <u>continued issuing them</u> anyway. One reason cited in disciplinary records is that issuing warrants increased his judicial productivity credits, a formula set in statute used to calculate a justice of the peace's pay. As a result, issuing more warrants "directly impacted his personal financial gain."

When a Maricopa city council member was arrested for DUI—an obvious conflict of interest—Sulley had the case transferred to Casa Grande justice court. Sulley suggested he'd done the councilman a favor because the Casa Grande judge is "very lenient."

The supreme court issued an order barring Sulley from performing any judicial duties in February 2014.



He was later slapped with a lifetime ban from ever serving as a judge and was disbarred by the supreme court, meaning he could not practice law.

# RARE REMOVALS

Aside from Sulley, the Arizona Supreme Court has removed only one other municipal court judge from the bench for misconduct since 1995, according to records from the state Commission on Judicial Conduct.

In the 1995 case, the supreme court found a Tempe Municipal Court judge had separately assaulted three people, including his ex-girlfriend, and that "alcohol played a role" in all of the attacks. The judge also was convicted on charges of soliciting a prostitute, which the court deemed a crime of "moral turpitude" in the order stripping him of his judicial duties.

The Tempe court was in turmoil at the time. The city's presiding municipal judge, Stephen Mirretti, was indicted on charges of fraud, theft of public money, bribery, and conspiracy to obstruct a criminal investigation, all felonies. Mirretti resigned in 1994, before the supreme court could remove him, and ultimately reached a plea agreement on the criminal charges. The supreme court did disbar him 11 months after he resigned from the bench.

Four municipal court judges resigned and were barred from ever holding judicial office in Arizona again as part of negotiated agreements to settle judicial disciplinary proceedings, including two in 1996. One of them, an Apache Junction judge, was accused of ignoring state laws, and exceeded her authority when issuing orders of protection and injunctions against harassment. Her term in office expired prior to the sanction being imposed.

Another judge in the Miami city court was accused in 1996 of unethical resolution of civil and criminal traffic tickets, and refusing criminal defendants the right to a lawyer. The judge routinely and improperly dismissed traffic tickets, and when investigators asked her why, she replied of the defendants, "because they like me."

The third judge with a lifetime judicial ban was accused of falsifying affidavits to make it look like there were no backlogs in her Globe-Miami court in 2010.

The fourth judge, who was 73 years old at the time, was allowed to retire as St. Johns municipal judge in 2007 to settle pending disciplinary proceedings alleging he "failed to follow the law." He agreed not to serve as a judge again as part of an agreement.

Other city judges have faced less-serious discipline from the Supreme Court for misconduct.

A Tucson judge was removed from the bench by the city council in 2010 for sexually harassing attorneys, and later was forced by the city to resign. He was subsequently censured, had his law license suspended for two years, and was prohibited from ever again serving as a judge by the supreme court.

Ten other judges were censured, which is essentially a public rebuke and the most lenient formal sanction that can be imposed on a judge. Four other city judges have been suspended since 1994, but were allowed to return to the bench.

One of the judges was censured in 2005 for "appearing to show favoritism when he dismissed several charges and waived fines for a county official's relative," according to the case description.

Another judge was censured in 2004 for improperly releasing his daughter's friend from custody.

A third judge was censured in 2006 for ordering a husband and wife jailed while refusing to allow them to contact their attorney or child care provider.

Other misconduct by city judges that drew nothing more severe than a censure includes yelling at defendants, failing to allow defendants to speak with an attorney, using vulgar language, and communicating improperly with attorneys, prosecutors, witnesses, victims, or defendants.

# COLLECTION TOOLS

To ensure a steady stream of income, the judge in Ferguson aggressively used collection tools, such as arrest warrants, to make sure people were paying their fines, according to DOJ. Arrest warrants were routinely issued for people who missed court appearances or even a single payment on a fine. When that defendant was subsequently arrested, a new crim-

inal charge was added, which brought more fines and more legal complications.

"The evidence we have found shows that these arrest warrants are used almost exclusively for the purpose of compelling payment through the threat of incarceration," DOJ concluded. "Most strikingly, the court issues municipal arrest warrants not on the basis of public safety needs, but rather as a routine response to missed court appearances and required fine payments." Arizona law gives judges the power to use arrest warrants to compel attendance and payments.

A person who fails to show up for a scheduled hearing in municipal court can face a new misdemeanor charge of failure to appear if the underlying charge is a misdemeanor or a petty offense. A petty offense is a criminal charge for which the only penalty is a fine. It does not include civil traffic charges, such as routine speeding violations.

A person can be convicted of the new failure to appear charge regardless of the outcome of the underlying charge that led to the missed court date. So a person acquitted of the underlying charge can still be convicted on the failure to appear charge.

A different criminal statute authorizes arrest warrants to be issued if a person fails to pay a fine or misses even a single payment.

Technically, that is treated as contempt of court, and the warrant is issued to ensure attendance at a hearing to determine why the payment was not made.

Regardless, the person can still be held in jail until a hearing in front of the judge. If the judge determines the person had the ability to pay but chose not to, the defendant can be held in jail until all outstanding fines are paid.

Arrest warrants probably cannot be issued for missed payments or failing to appear in civil traffic cases, either directly or in a roundabout way through a contempt of court proceeding, according to the state courts office and most judges surveyed by the Goldwater Institute. The law is unclear.

But what frequently does happen is people who miss a payment or court date related to a civil traffic ticket have their driver's license suspended, and are subsequently arrested for driving on a suspended license, a criminal charge. Driving on a suspended license is the most common criminal traffic violation in Arizona.

# FAILURE TO APPEAR

Judges routinely issue failure to appear warrants for people who miss court dates or fine payments in misdemeanor cases, including ordinance violations, according to information on various city court websites.

"When a person fails to appear for a scheduled court date, a warrant is issued," the Glendale City Court says on its website. "The defendant may be arrested. A warrant will be issued if a person is required to pay a fine or to complete a sentence and fails to do so."

The Mesa Municipal Court has similar language:

"A warrant of arrest can be issued for several reasons. This can include but is not limited to non-compliance with a Court order or failing to appear in Court as directed. A warrant for non-compliance may be issued if fine payments, jail time, counseling or treatment sessions are not completed as ordered."

And from the Page Magistrate Court website:

"Arrest warrants will be issued for failing to appear. Each time the Court is forced to take this action, additional fees are added to the amount owed."

Taylor, the Phoenix judge, says issuing an arrest warrant for people who do not obey court directives in criminal misdemeanor cases is standard practice in Phoenix and other Arizona cities, just as it was in Ferguson.

Judges do not have many options to compel people to pay their fines or show up to court, Taylor said.

In Phoenix, the court staff will attempt to contact people who have missed court dates or payments involving misdemeanor charges. Prior to issuing an arrest warrant, an order to show cause hearing is scheduled and the defendant is served with a summons to appear and explain why court dates were missed or fines were not paid.

Usually new arrangements, such as payment plans, can be worked out to get the person into compliance with court orders, said Taylor.

If a defendant fails to show up for the hearing or fails to abide by other court orders, a warrant will be issued in Phoenix, Taylor said.

"I don't have any other way to compel the attendance of the person to be accountable and compliant other than an arrest warrant," Taylor said. "Unless we are going to say when they thumb their nose at the court just let it all go, what's the court supposed to do?

"In Phoenix you have to bend over backwards to ignore the court to end up in the situation where the court's only real recourse in a criminal case, whatever it is you failed to do, is an arrest warrant."

There were 248,472 outstanding warrants issued by municipal courts in Arizona for the arrest of people who failed to appear, according to state data for the 2016 fiscal year. Of those, 135,273 were for cases involving misdemeanors and the rest were for criminal traffic offenses.

Of the criminal traffic warrants, about 45,000 involved DUIs or what are considered "serious" criminal traffic violations, such as leaving the scene of an accident or reckless driving. The other 68,468 were for criminal traffic offenses not deemed "serious" in state reports, such as driving on a suspended license.

Phoenix had 39,211 outstanding arrest warrants for failure to appear violations in 2016.

# 'SAME PROBLEM EVERYWHERE'

Arresting people for failing to appear or pay a fine for what started as a minor offense highlights another problem cited by the DOJ in Ferguson.

Every time an arrest warrant is issued, the person faces new charges, fines, and fees that often make it even less likely they will be able to keep up on their payments or ever clear the underlying charges, the DOJ found. The routine use of arrest warrants also means people can be jailed for minor ordinance violations and other charges that would not normally entail jail time.

In Arizona, Maricopa County Sheriff booking records show 1,249 people were jailed last year on charges involving violations of city ordinances. The most common offenses had to do with escort services and prostitution, 254 cases.

Prostitution is already a crime under state law, but many cities also adopt their own criminal ordinances,

allowing them to set their own fine amounts and ensure the cases stay in city court.

The second most common types of ordinance violations that led to an arrest involved people who were illegally camping or loitering on city property, usually parks. Other common charges included urinating in public and having unleashed dogs.

All of those are criminal violations in city codes.

Arresting people who can't pay their fines treads dangerously close to jailing people for poverty, the DOJ warned in Ferguson. That runs afoul of both the U.S. and Arizona constitutions.

When people are arrested on a failure to appear or failure to pay warrant, which usually occurs in a traffic stop, they will wait in jail until a hearing is scheduled in front of a judge. That must happen within 24 hours.

If the judge determines the person is willfully disobeying the court's orders by not showing up or paying fines, the defendant can be held longer.

Usually, the only way to get out of jail immediately is to pay the full amount of what is owed for the underlying charges, said Mike Reeves, a Phoenix attorney who has spent about 30 years practicing in municipal courts.

"All of these problems you hear of in Ferguson, I think they exist everywhere," said Reeves, vice chair of the State Bar of Arizona's Criminal Justice Executive Council. "I don't think that they were unique to Ferguson by any stretch of the imagination. It could be that Ferguson was more lax in how they treat people or more draconian in how they issued arrest warrants. But it's still the same problem everywhere because people don't pay their fines."

# LOSING A LICENSE

The other tactic abused in Ferguson to compel payment of fines was the automatic suspension of a person's driver's license for missing a hearing or payment on a fine for a simple traffic violation, according to the justice department.

That is also standard practice in Arizona.

If you fail to appear for a civil traffic hearing, the

judge will most likely enter a default judgment that you are responsible—guilty—and order that the entire amount of the fine is due, according to information on various city court websites. The court will then notify the state motor vehicle division (MVD), which will automatically suspend your driver's license.

Driving on a suspended license is a criminal misdemeanor. That means if you are stopped again, you will face arrest and criminal charges, even if the underlying offense is nothing more than a minor traffic violation.

Other penalties apply for missed payments on traffic tickets in Arizona, not all of which were cited as problems in the Ferguson report.

In addition to suspending your driver's license, the state will place a hold on your vehicle registration, and you will not be able to renew it until the fines are paid. The Arizona Department of Revenue will put a hold on any tax refunds you are otherwise entitled to, and the debt can be turned over to a private collection agency.

There also will be additional fines and surcharges ordered against you, which will also have to be paid before you can get your license back, though the judge can modify that requirement.

Examples of how quickly things can escalate are found on the legal website Avvo, which has a forum for people to submit questions for legal advice.

One person described being cited in Mayer, Arizona, for failing to have proof of insurance. The driver was insured, and mailed proof to the court, which claimed it did not receive it. So the person's driver's license was suspended for failure to appear or failure to pay.

The first the driver learned of the license suspension was when he was later cited in Scottsdale for driving on a suspended license, according to the Avvo description.

"After I went to the Mayer court they waived the fine and had the suspension lifted, but now I am facing two criminal driving on a suspended license for FTA/FTP, plus had my truck impounded that cost $150," the driver wrote. "I have no money for a[n] attorney or the hefty fine that is possible along with jail time. If I go to jail, I will lose my job. I can't believe this all because I didn't have my [insurance] card in the car that day."

In 2014, 53 percent of all defendants who were initially charged for civil traffic violations and lost their licenses because they failed to appear in court were later cited for the criminal charge of driving on a suspended license, according to data from the state office of the courts. About 41 percent of all criminal traffic offenses were for driving on a suspended license.

Last year, the state suspended the driver's licenses of 74,001 people for failing to appear or pay a fine in municipal court, according to records from the state MVD. The most common underlying violation that led to a license suspension in city court was speeding, which accounted for more than 17,000 of the suspensions.

DUIs, including extreme DUIs, accounted for about 3,800 of the suspensions, according to MVD data.

You don't even have to be driving to lose your license for failing to appear in city court.

There were 239 people who had their driver's license suspended in city court because of failure to appear or pay a ticket related to violations that occurred when they were pedestrians, such as crossing against a light or outside of a crosswalk. Another 162 of the license suspensions involved people who were riding a bicycle at the time they were initially ticketed.

# 'BLOOD FROM A TURNIP'

The punitive tools city court judges use to compel payment can create a vicious cycle in which people who cannot pay their fines are continually hammered with new penalties, said Alessandra Soler, executive director of the American Civil Liberties Union of Arizona.

People who commit minor traffic violations are routinely hit with hundreds of dollars in fines, fees, and surcharges they cannot afford to pay. So they miss a payment, and their license is suspended. They continue to drive because they have to get to work. If they are stopped, they face more charges, more fines, and possibly jail time. Unable to get to work, they lose their jobs. In the end, they are left unemployed, poorer than before, and even less likely to be able to pay their ever-mounting debts to the court.

"These practices, these excessive financial obligations, these improper practices for enforcing court debt

can have extremely harmful consequences for people," Soler said. "They are criminalizing the poor to increase their own profits. The consequences are horrific for families.

"Some of these people are connected to the criminal justice system for years, until they pay off these fines. They live under this constant threat of being sent back to jail because they can't pay this unmanageable legal debt."

The harsh measures to collect money also are a bad investment of taxpayer money, Soler said. It makes no sense to spend thousands of dollars to put someone in jail to collect a few hundred dollars in fines.

"They are spending a tremendous amount of resources trying to get blood from a turnip," she said.

Some cities have begun collecting overdue fines using techniques that are less harsh. The Mesa and Glendale municipal courts and the Pima County justice courts have implemented a telephone notification system that alerts defendants of upcoming court dates, missed payments, or the issuance of arrest warrants. The result is a reduction of up to 24 percent in the number of people who fail to appear or comply with court orders.

Phoenix Municipal Court recently implemented a program that notifies defendants whose driver's licenses have been suspended that they can come to court, make new arrangements, and set up payment plans in return for having their license reinstated. In the first four months, more than 5,200 people took advantage of the program, resulting in the payment of $2.3 million in outstanding fines.

Breaking the spiraling cycle of debt and incarceration for what began as minor offenses was the task of the Fair Justice for All committee, created by Arizona Supreme Court Justice Bales in March 2016, a year after the DOJ's Ferguson report came out.

While the committee made passing references to revenue-raising pressures compromising judicial independence, as happened in Ferguson, the Justice for All task force did not recommend any structural changes to municipal courts in Arizona, including to how judges are appointed.

Instead, the committee focused primarily on debt-collection techniques that disproportionately hurt the poor.

> "They are criminalizing the poor to increase their own profits. The consequences are horrific for families." - *Alessandra Soler, American Civil Liberties Union of Arizona*

Three bills were introduced in the legislature to implement much of what was recommended by the committee. The governor signed one bill, giving municipal judges more ability to hold mental competency hearings in misdemeanor cases. The other two bills failed. One would have made it easier for courts to mitigate fines and allow community service in lieu of financial sanctions. The other would have made driving on a suspended license a civil traffic violation rather than a criminal misdemeanor if the suspension was the result of failing to appear or pay a fine.

Missing from the Justice for All report is anything that would insulate local judges from political pressure, other than the generic warning that judicial independence must be maintained.

Previous study committees have made that attempt, all without success.

Since the 1950s, a half-dozen task forces and special committees have been created in Arizona to study city and justice courts. They have pretty much all recommended eliminating municipal courts and taking away the power of city councils to appoint judges.

# NOTHING HAS CHANGED

The first to make that recommendation was a committee created by the American Bar Association to study Arizona courts in 1952. Similar recommendations to eliminate municipal courts, usually by folding them into county superior court, have been made by various study committees in 1958, 1972, 1981, 1989, and 1995.

The two most recent committees were created by the chief justices of the Arizona Supreme Court who were serving at the time.

"Since 1952, every major court reform study has recommended some degree of unification and improved management of the courts," the 1995 committee reported. "Despite strong evidence to support these recommendations and the offering of several viable, common sense solutions, there have been no significant statewide structural changes to the court system in Arizona."

Nothing has changed since then.

Several of the committees also recommended merit selection for all judges, and funding all courts through the state rather than through local jurisdictions. Merit selection is a method whereby superior court judges in Maricopa, Pima, and Pinal counties, as well as all appellate court judges in Arizona, are appointed by the governor from a list of nominees selected by an independent committee. Subsequent to the initial appointment, the judges face retention elections in which voters decide whether they will remain.

In 1974, voters established merit selection for all Arizona appellate judges and for superior court judges in Maricopa and Pima counties. Pinal County was added later because of population growth. Superior court judges in other counties are elected.

The prior efforts to reform municipal courts in Arizona have been fought by cities and their primary lobbying organization, the League of Arizona Cities and Towns. So far, they've always won.

Stanley Feldman, the former Arizona Supreme Court chief justice who created the 1995 commission, said he was concerned at the time about local forces influencing the independence of city judges. That might be pressure to raise revenue, but also political influence by powerful city insiders seeking special treatment.

"In some communities there may be political pressure from the town council or the city council on the judges to be revenue positive, so to speak," Feldman said in a recent interview with the Goldwater Institute. "There's always the danger of that, and that's always the danger of the people who do the appointing."

*"In some communities there may be political pressure from the town council or the city council on the judges to be revenue positive, so to speak."*
*- Stanley Feldman, former chief justice of the Arizona Supreme Court*

Retention elections would solve some of that, though elections also have their downsides, Feldman said. But at least the judges would answer to voters, not to the politicians who have other priorities, he said.

# 'A DARK HOLE'

Gordon Griller of Scottsdale agrees the current system of having judges appointed by city councils is "a dark hole in a lot of ways."

Griller has long been in the middle of the debate over political influence on city court judges. He is the principal court management consultant for the National Center for State Courts, an independent, nonprofit clearing house for information about best court practices and data, created in 1971 at the urging of former Chief Justice of the U.S. Supreme Court Warren Burger.

Griller was project director of a study done for the Missouri Supreme Court to develop reforms to the municipal court system in that state after the Ferguson investigation. He is separately working with St. Louis County, where Ferguson is located, to make changes to the more than 80 city courts there.

In 2010, Griller was chairman of Scottsdale's Judicial Appointments Advisory Board, a committee specifically created by the city to take politics out of the appointment and retention of judges.

During his tenure, the city council opted not to reappoint one associate city judge, who had been criticized by a close political ally of Mayor Jim Lane. The council also initially chose not to retain the presiding city judge, citing budget concerns they did not explain, but later backed off and reappointed that judge to one final two-year term.

The judicial advisory board had unanimously recommended the retention of both judges.

Concerns about political interference and financial pressures exposed in Ferguson also were present in Scottsdale, said Griller, who left the city advisory board

a few months after the controversy involving the judges. Even many of the reforms that were recommended in Ferguson, such as independent judicial advisory boards, proved an ineffective foil to political influences in Scottsdale, he said.

Beyond revenue issues, city judges also might face pressure to allow questionable practices implemented by the police department or policy priorities of the city council. In Ferguson, it was ticket quotas for police. In other cities it might be crackdowns targeting things such as massage parlors, tall weeds, or unleashed dogs.

One of the duties of judges is to be a "check on unlawful police conduct," as the DOJ put it in its Ferguson report. Being that check is especially difficult when the judge, especially one with a two-year term, knows the city council will decide on reappointment when the term expires, Griller said.

"If I was the architect of the state constitution, I would have never set up a situation where the municipal courts are subservient to the city executive and legislative branch," Griller said. "It just does not serve the interest of justice well. The judges have to be independent enough to be able to rule based on the law and the facts, and not be always thinking in the back of their minds about revenue generation or about supporting the city police department.

"It just is too difficult, too dangerous, and it does not give the judges the independence that they need."

# UNDUE INFLUENCE

What happened in Scottsdale demonstrates the ineffectiveness of many well-meaning reforms that are supposed to check the political interference of city councils over judges, Griller conceded.

The trouble started in late 2009 when Jack LaSota, a former state attorney general and then legal advisor to Mayor Lane's campaign, sent a letter to the city complaining about Wendy Morton, a Scottsdale associate municipal judge. LaSota's son was Lane's chief of staff at the time.

LaSota said he'd represented a mentally challenged man, for free, who had been cited for ticket scalping at the Phoenix Open in Scottsdale. He got what he considered a particularly bad ruling from Morton.

LaSota's client was cited for selling the tickets on private property used by event promoters near the entrance to the golf tournament. Since the man was on private property, he was not in violation of the Scottsdale ordinance prohibiting ticket sales on a public street, LaSota argued.

Morton ruled that the ordinance encompasses more than just public streets and includes areas set aside for public use, including the entryway into the Open where the man was cited. She fined LaSota's client $88 and ordered the forfeiture of another $226 seized by police.

LaSota said he was so upset with Morton's performance he felt obliged to bring it to the attention of city officials. As it turned out, Morton was up for reappointment, and LaSota saw a notice in the newspaper soliciting comments. So he sent his letter outlining his gripes against the judge.

LaSota knew it might look bad, given his connections to Lane. But his connections to the mayor should not disqualify him from raising concerns about the judge he had based on his own experience, he said.

"I was trying to influence the process, but not unduly," LaSota told the Goldwater Institute. "I certainly wrote the letter in the hopes they would say 'wait a minute, let's take a look at this judge.' Absolutely I was trying to influence this process.

"Her ruling was so obnoxious that I knew I had to do something about it," LaSota said of Morton. "The city council shouldn't regard it as any big deal. I'm just another guy, and I wanted to express my opinion."

The city council apparently did think it was a big deal. It voted 4-3 against reappointing Morton in January 2010. Lane was among those voting against retention.

Council members cited concerns about appeals and reversals of Morton's rulings, but did not explain, according to meeting minutes and media coverage at the time.

Morton went on to work as a municipal court judge in Phoenix, and is now a Maricopa County Superior Court commissioner. She declined a request for an interview.

Griller said Morton's dismissal by the council was "more political than anything else."

"We were sort of window dressing in a lot of ways, which eventually became apparent," Griller said of the advisory board. "This back channel approach with a prominent lawyer, I conclude, was the primary reason that she was not reinstated."

# 'POLITICAL HACKING'

About the same time, Monte Morgan was also coming up for reappointment to his fifth two-year term as presiding judge.

The council voted in February 2010 not to reappoint Morgan on a 4-2 vote. Lane voted for retention.

Council members did not explain their decision, other than to cite budget and administrative concerns, according to council minutes and media reports.

Three days later, the council reappointed Morgan in a special meeting on a 5-2 vote. Council members did not explain the reversal.

Morgan said both he and Morton got caught up in political infighting among city council members who could not get along with each other and wanted to show they were in charge.

"It was manslaughter on both counts," Morgan said of the council's actions against himself and Morton. "They did it on the basis of political hacking.

"They were fighting among themselves over every issue," said Morgan, now presiding municipal judge in El Mirage. "They were just on fire and it didn't take much to upset them. They were going to clean house. They were going to clean the swamp. They didn't care."

City judges do not have much protection from political pressure in Arizona, Morgan said. Two-year terms and the ability of city councils not to retain them for just about any reason means judges who do buck the priorities of the city councils, prosecutors, police, or budget directors risk being out of a job.

"If you are a weak-kneed judge you are going to fold on a sneeze," he said. "The higher the integrity of the judge, the less that is going to happen."

Despite that, Morgan says having city councils appoint judges is not a bad system if both sides take seriously their responsibility to avoid political influence. Some improvements could be made, such as strengthening judicial advisory boards and making it harder for councils to overturn their recommendations.

"The system that we have in place for appointing municipal judges is very good," Morgan said. "It's all pilot error, the carrying out of a really good scheme by very bad players. It doesn't matter what kind of a scheme you have, if you've got bad players involved you are going to have a bad result . . . But the process is fine. It's very workable. It's very doable. It's very reliable. Here's a guy talking who took the brunt of the political malfeasance."

# UNCLEAR LINES

Lane told the Goldwater Institute he has tried to protect the independence of city judges since he became mayor in 2009.

Politics was not what motivated his vote against Morton, he said. Rather it was concerns about her courtroom demeanor, which were raised by the judicial advisory board, even though it ultimately recommended her retention.

Asked directly whether LaSota's letter influenced him, Lane replied:

"I'm sure it did. But did it unduly or because of the relationship? I don't think so.

"It's the culmination. It's the entire process that JAAB went through, which included LaSota's letter as well. It's the entire picture that was presented for her."

As for Morgan, Lane said he cannot explain why other council members initially voted against retention. Lane added he worked behind the scenes to get them to reverse their decision. Comments some of them made about budgets and administration do not mean they were pressing Morgan to raise more money, Lane said. As presiding judge, Morgan also had administrative duties to ensure the courts were operating efficiently and effectively.

Council members should not interfere with judges when it comes to decisions in their courtrooms, Lane

said. But they do have a responsibility to make sure tax dollars are not wasted and that the presiding judge, like any other city employee, meets performance expectations.

It's not always clear where the line is that separates the two.

That was particularly true when Morgan was up for retention. The national recession had caused a steep drop in city revenues, and all departments were forced to make cuts, Lane said.

"I don't believe there was an effort really to have the court system become a moneymaking new stream of business," Lane said. "We were just more concerned of it spending their money wisely so that there wasn't having to be some unnecessary increases coming out of the general fund, because the money simply wasn't there.

"I don't know where you cross the line. There is no real effort to try to, in any way, damage the independence of the court system and the judges with city hall. We stay far afield of trying to influence the judges in any way, shape, or form in the judgments that they call in the courtroom. But when it comes to administration and management, they do have some responsibility to city hall to operate efficiently and effectively and, frankly, within budgets. I don't know whether that's exceeding our authority or not, but that's the distinction I would have drawn in the past."

# 'MONEYMAKING MACHINE'

The intrigue over judges continues in Scottsdale. Sandra Schenkat had a complaint against a city judge. Schenkat did not like his ruling against her in a 2012 case involving an ugly and protracted battle with a fellow member of her homeowner's association board.

That would normally not be much of a problem, except that Schenkat is in her second term on the Scottsdale Judicial Appointments Advisory Board, and the judge was coming up for a retention vote by the council last April.

Because of her dispute with the judge, Schenkat recused herself from participating in the board's as-

sessment. However, as a private citizen she sent a letter outlining her complaints and recommending he not be reappointed.

Coincidently, about that same time, the Goldwater Institute filed a public records request seeking all documentation related to the city council's personnel reviews of its judges.

Within two hours of delivering her letter to the city clerk, Schenkat got a call from Lane asking to meet with her. Lane pressured her to withdraw the letter, saying it would create problems for the city in light of the Goldwater Institute's investigation, she said.

After she refused, Lane sent her a letter recommending she resign from the board, citing concerns she'd implied judges in Scottsdale are tied too closely to city prosecutors.

She refused to quit.

Schenkat later was asked by two other members of the council not to testify against the judge at the April 4 council hearing, at which he was unanimously reappointed.



"The court is set up as a moneymaking machine, and they are just happy to know there is revenue coming in. They don't want to upset that apple cart. So they are complicit with bad justice in the name of revenue."
- *Sandra Schenkat*

"Obviously they don't feel that any negative comments should even be expressed," Schenkat said of the council.

She stands by her previous concerns that the judges in Scottsdale are too sympathetic to prosecutors, adding that's an attitude the council seems to favor.

"The court is set up as a moneymaking machine, and they are just happy to know there is revenue coming in," she said. "They don't want to upset that apple cart. So they are complicit with bad justice in the name of revenue."

Lane said he did not ask Schenkat to withdraw her letter but rather suggested it would be best if she did not testify against the judge, or at least that she make it clear she was speaking as a private citizen and not a member of the judicial board.

Lane did ask her to resign later because, in his view, Schenkat had clearly let her personal animosity toward one judge taint her independence and objectivity, he said.

# ACCEPTABLE ALTERNATIVE

Pressure on city judges does not just come from city councils. As was seen in Ferguson, police and prosecutors also rely on compliant judges to allow practices that are both lucrative and controversial.

In Ferguson, it was ticket quotas.

In Scottsdale, it is photo radar.

If you get a photo radar ticket, the standard form of notification is sending a letter in the mail advising you of the violation and instructing you how to either pay or contest the ticket.

You can ignore that because mailing a letter is not considered adequate service in Arizona. If you do not respond, the ticket must be dismissed after 90 days.

To get around this, cities must serve you with a notice of a photo radar ticket in person. That means they have a process server deliver the notice. That is expensive.

If the process server is unable to serve you in person, the ticket must be dismissed.

Except in Scottsdale.

That city has developed a different method, which it calls "alternative service." If a process server makes three unsuccessful attempts to deliver the notice, Scottsdale's policy allows you to be served through a certified letter in the mail and a notice taped to your door.

The Scottsdale City Court signed off on the practice. Scottsdale is the only city in Arizona that uses it.

Default judgments are entered against people who still do not show up for court. Until recently, their driver's license was automatically suspended just as it would be for other missed court appearances.

The Arizona Legislature put a crimp in the practice last year. It did not ban alternative service. Rather it passed a new law prohibiting the suspension of a person's driver's license if they received notice of a photo radar ticket through alternative service.

Scottsdale continues to use alternative service, in spite of the new law.

The city anticipates raising about $3.8 million through photo radar in the 2017 fiscal year, almost as much as it will raise through all other court cases combined, including parking violations. In 2016 it paid almost $1.6 million to the vendor who operates the cameras.

Joseph Olcavage, presiding municipal judge in Scottsdale, said the decision to use alternative service came from city prosecutors, not the court. He doesn't know why it's not used in other cities.

Alternative service is permitted in the law, and has been upheld as a legitimate form of notification for photo-radar tickets by the Scottsdale courts, Olcavage said. Anyone who disagrees with the policy can challenge a conviction by appealing.

"The law is there, so unless they find the law unconstitutional—that would be at the court of appeals or the supreme court level—it is what it is."

It's not the job of city judges to question policy decisions of the police, prosecutor, or city council, or to be a "check on unlawful police conduct," according to Olcavage, a view shared by several other judges interviewed.

"It's not our job to tell another branch of government what to do," he said.

Cases are handled on an individual basis. That means if the police and prosecutors meet all constitutional and legal requirements, and they present suffi-

cient evidence that the individual defendant is guilty, the judge has a duty to convict, Olcavage said.

If not, the charges will be tossed.

# 'DANGER OF INJUSTICE'

Federal and state appeals courts have not done much to limit city courts or protect city judges from political interference, aside from occasionally appointing a study committee and issuing guidance that judges should not be swayed by political interests.

The two most important cases in which the U.S. Supreme Court looked at the issue of whether city courts can deliver a fair hearing to defendants both involved municipal courts in Ohio where the mayor also served as the judge.

The first case is _Tumey v. Ohio_, decided in 1927. In _Tumey_, the mayor received a payment for each conviction, but none for acquittals. The Supreme Court tossed out that arrangement, declaring that the direct financial interest impeded the defendant's ability to get a fair trial.

It wasn't that the judge in that particular case was necessarily swayed by the $12 he received for the conviction, the justices found. Rather the structure of the court itself was a violation of the defendant's due process rights.

"The requirement of due process of law in judicial procedures is not satisfied by the argument that men of the highest honor and the greatest self-sacrifice could carry it on without danger of injustice," the court wrote.

The second case, _Ward v. Village of Monroeville_, decided in 1972, invalidated a similar court setup in which the mayor sat as the city judge but was not paid directly through a portion of the fines collected. The high court found that because the mayor had revenue-raising responsibilities for the town, the defendant could not get an impartial hearing.

Justices also rejected the state's claim that, since the

defendant could get a new hearing by appealing the city court conviction, any errors at the local level could be remedied by a higher court.

In Ohio, the defendant was entitled to what's called a de novo appeal, which is basically a new trial in which the state must again prove its case and the defendant is presumed innocent.

"This 'procedural safeguard' does not guarantee a fair trial in the mayor's court," the Supreme Court ruled. "Petitioner is entitled to a neutral and detached judge in the first instance."

Even that safeguard is not afforded in appeals from municipal courts in Arizona, which go to county superior courts.

Defendants are <u>not entitled</u> to a de novo review. No new evidence is presented. No witnesses are called. The superior court judge will reverse the city court only if it finds the judge erred on a question of law or gave a decision that is plainly contrary to the evidence, and that any mistake "was so important that it likely affected the outcome of the case."



Appeals of cases originating in city court are not allowed beyond the superior court unless the defendant is <u>challenging the validity</u> of a law, fine, or tax.

Appeals of ordinance violations or civil traffic citations are rare, said Reeves, the Phoenix attorney. They are hard to win, and the cost of appealing far exceeds whatever fines are levied, he said.

Appealing a responsible verdict is especially difficult for a traffic citation. Normal rules of civil procedure do not apply, as they would in a criminal case. And judges are free to consider whatever evidence they deem relevant.

In typical civil traffic hearings, there is no prosecutor. A police officer or city representative explains why a ticket was issued. Defendants then give their side, and the judge makes the decision.

A sampling of appeals from city courts to Maricopa County Superior Court shows the most typical case involves a DUI, a criminal traffic offense. Convictions are rarely overturned.

# FASTENING THE LID

The two most relevant appeals that did reach the Arizona Supreme Court were brought by judges claiming the city council overstepped its bounds when it fired them.

In a 1985 ruling, the court rejected the claims from two cities that municipal court judges are "at will" employees, like everyone else on the city payroll, and can therefore be fired without any reason.

The supreme court said that since municipal judges are part of the integrated court system in Arizona, firing them without cause would violate the separation of powers between the legislative and judicial branches required by the state constitution.

City judges must have fixed terms in office to protect them from politics, the court decided. While it did not say how long the term should be, it said nothing under two years would be satisfactory.

In 1994, the Arizona Supreme Court decided in a case out of Tucson that cities could remove a judge midterm for sufficient cause. It did not specify what cause would be deemed sufficient.

In that case, the city judge ordered the release from police custody of her live-in boyfriend, and the council voted to fire her shortly thereafter.

The supreme court agreed with the city's argument that the council does have the power to fire a judge if it has good cause.

The court suggested in a footnote that a four-year term would be more appropriate, but did not require it.

That was the case Justice Frederick Martone said "fastens the lid on the coffin of judicial independence."

Taken together, the two cases mean cities must have a good reason to fire judges during their fixed terms. However, the councils can opt not to reappoint a judge for almost any reason when the term ends, according to guidance from the office of the courts.

Sweeping reforms to city courts tend to come from legislatures or voters, not court cases or judicial decrees.

It was voters in Arizona who explicitly put oversight of municipal courts under the state supreme court when they passed an amendment to the state constitution in 1960.

In California, voters passed a constitutional amendment in 1998 that eliminated municipal courts by folding them into the county courts system, much the way that multiple reform committees have recommended in Arizona since the 1950s.

In the wake of the Ferguson report, the Missouri General Assembly enacted a series of reforms that limit the percentage of a city's general fund that can come through traffic fines. It also capped fines, prohibited jail time for certain local ordinance violations, and reduced fines and fees for traffic offenses.

The Institute for Justice, a nonprofit legal advocacy group, also filed a federal lawsuit in 2015 challenging what it calls the unconstitutional use of criminal ordinances to raise revenues in the Missouri town of Pagedale, located in St. Louis County.

After the Missouri legislature limited the amount of money cities could keep from traffic fines, towns like Pagedale stepped up enforcement of nontraffic ordinance violations, according to the lawsuit. Town ordinances prohibit people from having a basketball hoop or wading pool in front of their houses, ban front yard barbecues except on national holidays, and require windows facing the street to have drapes or blinds "which are neatly hung," according to the lawsuit. Violation of many of these ordinances carry penalties of up to three months in jail and a $1,000 fine.

Pagedale's reliance on penalties from minor ordinance-related offenses violates the constitutional due process rights of the defendants and the prohibition against excessive fines, the complaint alleges.

# RELIEVING THE PRESSURE

In Utah, it was pressure from the state supreme court that led to a complete makeover of the municipal courts in 2008, six years before the events in Ferguson made it a national issue.

City courts are called justice courts in Utah. At the time, the method of appointing and retaining judges was similar to Arizona's.

Rick Schwermer, state court administrator in Utah, said that since his appointment as the state's first justice courts administrator in 1990, municipal judges had complained to him that they were under too much pressure from city councils to raise money.

"We saw examples of a lack of judicial independence," Schwermer said. "First a mayor would refuse to reappoint a justice court judge, and it just sort of seemed like there were revenue issues. The judge would say 'I got called in because I didn't make budget.' These all point to judicial independence, but specifically that started us to a point toward we need to disentangle the judge from the money."

As in Ferguson, the pressure to raise revenue was subtle, Schwermer said. No judge was told outright to convict more people to generate more revenue.

Responding to those complaints, Utah Supreme Court Chief Justice Christine Durham in 2006 appointed a task force to review justice courts. Two years later, the committee recommended changes in the law aimed at "uncoupling the money and the judge."

Durham laid out the case for change to the Utah Legislature in her 2008 State of the Judiciary message, citing concerns about "a growing public perception that justice courts are vehicles for generating revenue."

The legislature made most of the changes recommended by the task force, including revamping the method of appointing and retaining judges.

Now, when a city has a court vacancy, a judicial selection committee screens and recommends candidates to the mayor. Judges are still appointed from that list by the mayor and confirmed by the council, but that's where their influence ends. Upon completion of their six-year terms, the judges must face voters in a retention election.

The new system has been a success, Schwermer said. Public confidence is up, and there are fewer complaints from judges about political pressure from mayors and councils.

"They don't have fear of any of the traditional ways of retaliation," Schwermer said of Utah judges. "The mayor can't unseat them. The mayor can't reduce their salary. In short, they have a measure of judicial independence."

Reform efforts in other states have not been so successful.

An investigation by the New York Times in 2006 prompted the chief judge of the New York Court of Appeals to appoint a study committee to recommend reforms. The committee concluded in 2008 that the city courts in New York might be unconstitutional because they did not provide defendants the right to a trial by a judge who is a lawyer. However, the committee concluded there was "no statewide political appetite" for changing the system.

Two years later, what the Times described as "the most ambitious effort in decades to reform New York State's vast network of small-town courts" failed when bills to implement changes died in the legislature. No significant reform efforts have been initiated since.

Reform efforts in New Jersey played out much the same as they did in New York. The Asbury Park Press published an investigation in 2016 that showed many cities there relied on their city courts as revenue generators, exposing many of the same practices that were used in Ferguson. Despite talk of reform from legislators, no major changes were passed.

# NOT JUST FERGUSON

There is no shortage of ideas about how to make city courts more independent and insulate them from political pressure, especially in the wake of Ferguson.

The Justice Department recommended a series of reforms to the Ferguson courts, mostly having to do with such things as limiting the use of arrest warrants and driver's license suspensions for missed court appearances or payments involving minor offenses. It did not address the way judges are appointed.

Arizona's Fair Justice for All task force made <u>similar recommendations</u> last year.

In 2014, the national Conference of State Court Administrators <u>recommended that the appointment</u> and retention of municipal judges should be handled the same way as for other judges in a state. That means in Arizona, all judges would face voters at some point, either by directly electing them to the bench or through retention elections after the judges' initial appointments.

"The opportunity for interference with judicial independence may be avoided by ensuring a process of election by voters or appointment and confirmation independent from the discretion of those who hold local political office," the study concludes.

The study conducted by the National Center for State Courts for the Missouri Supreme Court, the one headed by Griller, also concluded that <u>judges who are elected</u> rather than appointed by city councils "are better positioned to resist improper influences and job-related pressures from politicians or special interest groups."

However, that study did not call for elimination of council appointments. Rather it recommended a series of steps to give the state supreme court and presiding county judge greater influence and control over the operation of city courts. It also recommended that cities be required to have judicial appointment advisory boards, similar to the one that proved so ineffective in Scottsdale.

Griller said his organization did not recommend electing judges in Missouri because other groups were already pushing for that. The supreme court justices did not seem prepared to take up that fight, which would require legislation and possibly a constitutional amendment.

The national Conference of Chief Justices, an association of top judicial officials from all 50 states, and the Conference of State Court Administrators <u>created a special task force</u> in February 2016 to come up with reforms to address the problems identified in Ferguson. So far, it hasn't issued any recommendations dealing with how cities should appoint their judges, and its final report is not expected until later this year at the earliest.

What ultimately needs to happen is that mayors and council members who appoint city judges need to understand that the courts are there to dispense justice, not to raise money, said Maureen O'Connor, chief justice of the Ohio Supreme Court and co-chair of the task force.

"As we began work on the issue, it soon became apparent that this is not just a problem in Ferguson, Missouri. It's something that has permeated nationally in our courts," O'Connor said in an interview <u>published last year</u> by *Judicature*, a scholarly journal for judges. "I think it's a misunderstanding, and it's an attempt by non-judicial officers in many cases—and by that I mean elected officials in many jurisdictions—to look to the courts to be revenue centers. And that seems to be the problem." ⚙



TELL US YOUR CITY COURT STORY

If you've experienced any of the problems described in this story, we'd like to hear from you. Please email us with a brief description of your case, why you think you were treated unfairly and the best way to contact you. Your contact information will remain confidential.

Email us at citycourt@goldwaterinstitute.org

# TOP DOLLAR COURTS

## MUNICIPAL COURTS WITH THE HIGHEST EARNINGS IN ARIZONA

**Note:** Information is derived from state-mandated budget summary schedules. Court revenue is based on reported "Fines and Forfeits" line in city budget documents. Some cities provide a single figure while others list multiple lines for different types of court-related fines, which were totaled. Revenue represent only the amount of money retained by the city through its general fund, and does not include additional money raised by the courts from state surcharges and fees that is not retained by the city. Expense figures only include money spent from the general fund. Many cities augment their court budgets with special enhancement funds, or through state and federal grants.



**PHOENIX**
INCOME RANK: 1
Court Revenue:  $15,242,000
Court Expense:  $ 28,112,455

**TUCSON**
INCOME RANK: 2
Court Revenue: $10,478,630
Court Expense:  $9,380,940

**TEMPE**
INCOME RANK: 3
Court Revenue: $8,404,268
Court Expense:  $4,396,533

**SCOTTSDALE**
INCOME RANK: 4
Court Revenue: $7,766,086
Court Expense:  $4,742,649

**MESA**
INCOME RANK: 5
Court Revenue:  $6,626,035
Court Expense:  $7,665,301

**GILBERT**
INCOME RANK: 6
Court Revenue:  $3,576,000
Court Expense:  $3,237,830

**PARADISE VALLEY**
INCOME RANK: 7
Court Revenue:  $3,347,490
Court Expense:  $705,290

**FLAGSTAFF**
INCOME RANK: 8
Court Revenue:  $3,298,980
Court Expense:  $3,165,706

**CHANDLER**
INCOME RANK: 9
Court Revenue:  $3,240,900
Court Expense:  $4,417,406

**PEORIA**
INCOME RANK: 10
Court Revenue: $1,595,674
Court Expense:  $1,972,926

**AVONDALE**
INCOME RANK: 11
Court Revenue: $1,311,380
Court Expense:  $982,760

**YUMA**
INCOME RANK: 12
Court Revenue: $1,210,000
Court Expense:  $1,815,993

1

**SCOTTSDALE CITY ATTORNEY'S OFFICE**
3939 North Drinkwater Boulevard

2

Scottsdale, Arizona  85251
(480) 312-2405

3

Lori S. Davis (SBN: 027875)
legal@scottsdaleaz.gov

4

**Attorneys for Defendant**

5

6

**IN THE SUPERIOR COURT OF THE STATE OF ARIZONA**

7

**IN AND FOR THE COUNTY OF MARICOPA**

8

Michael Petramala;

9

   Plaintiff,

Case No.: CV2018-012446

10

vs.

**NOTICE OF WITHDRAWAL OF DEFENDANT'S MOTION TO DISMISS**

11

City of Scottsdale;

12

   Defendant.

(Honorable Joseph Welty)

13

14

   Defendant City of Scottsdale hereby gives notice to this Court and the Plaintiff and

15

hereby withdraws its Motion to Dismiss filed on December 26, 2019.

16

   Plaintiff is a vexatious litigant and, pursuant to Maricopa County Superior Court AO

17

2015-184, is required to seek permission prior to filing any Complaint.  Defendant City was

18

not aware of the Ruling filed on September 14, 2018 allowing Plaintiff to file the instant

19

lawsuit, despite several attempts to confirm whether any required pre-screening had been

20

performed by the Court.  *See* Ruling of 9/14/18 (attached hereto as **Exhibit 1**).  Defendant

21

City was not endorsed on the Ruling and Plaintiff did not provide a copy of same to

17103146v1

undersigned counsel until *after* the filing of the Motion to Dismiss.  In addition, Defendant City researched the online docket and contacted the Clerk of the Court on October 1, 2018 to investigate whether Plaintiff had been granted authorization to file a Complaint in this matter, and Defendant City was informed that it "must have been overlooked" and "shouldn't have been filed."  Defendant filed its Motion to Dismiss in good faith after diligently attempting to confirm that Plaintiff had not received permission to file his Complaint.  It was not until Plaintiff submitted his Response to Defendant City's Motion to Dismiss and emailed a copy of the Ruling to the undersigned counsel that Defendant became aware of the Ruling authorizing the Plaintiff to file his Complaint in this case.

As Defendant is now aware of the Court's Ruling authorizing Plaintiff to file the Complaint, Defendant City hereby withdraws its Motion to Dismiss filed on December 26, 2018.

DATED this 4th day of January, 2019.

**SCOTTSDALE CITY ATTORNEY'S OFFICE**

By:   /s/ Lori S. Davis
    Lori S. Davis, Senior Assistant City Attorney
    3939 North Drinkwater Boulevard
    Scottsdale, Arizona 85251
    Attorney for Defendant

**ORIGINAL** of the foregoing
e-filed this 4th day of January, 2019 with:

AZ Turbo Court
Clerk of Superior Court

17103146v1

1

**COPY** of the foregoing mailed
this 4th day of January, 2019 to:

2

3

Michael Petramala
P.O. Box 60222
Phoenix, AZ 85082
Plaintiff

4

5

By: ___*/s/ Danielle Taebel*___
Scottsdale City Attorney's Office

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

# EXHIBIT 1

17103146v1

COPY

Chris DeRose, Clerk of Court
\*\*\* Filed \*\*\*
09/14/2018 at 8:00 a.m.

## SUPERIOR COURT OF ARIZONA
## MARICOPA COUNTY

AO 2005-184                                                  09/13/2018

                                                CLERK OF THE COURT
HONORABLE JANET E. BARTON                           A. Gonzalez
                                                       Deputy

IN THE MATTER OF PROHIBITING                MICHAEL PETRAMALA
MICHAEL PETRAMALA FROM FILING               PO BOX 60222
ANY LAWSUIT IN MARICOPA COUNTY              PHOENIX  AZ 85082
WITHOUT OBTAINING PRIOR PERMISSION
FROM THE COURT AND CONSOLIDATING
FEE REQUESTS


                                            JUDGE GATES


                              RULING


        On September 10, 2018, the Court received Mr. Petramala's Motion for Leave to File ADA
Employment Case Against Defendant City of Scottsdale.  Pursuant to that request, the Court
hereby authorizes Mr. Petramala to file an ADA employment case against the City of Scottsdale
raising the same claims he raised in his Notice of Claim dated July 24, 2018.  The Court's
authorization to file this lawsuit is not intended and should not be construed as any opinion by this
Court regarding the merits of such a case.


Docket Code 019                      Form D000B                              Page 1

Skip To MainContent

[          ]  [ Search ]

Civil Court Case Information - Case History

### Case Information

| | | | |
|---|---|---|---|
| Case Number: | CV2018-012446 | Judge: | Welty, Joseph |
| File Date: | 9/23/2018 | Location: | Downtown |
| Case Type: | Civil | | |

### Party Information

| Party Name | Relationship | Sex | Attorney |
|---|---|---|---|
| Michael Petramala | Plaintiff | Male | Pro Per |
| City Of Scottsdale | Defendant | | Lori Davis |

### Case Documents

| Filing Date | Description | Docket Date | Filing Party |
|---|---|---|---|
| 12/26/2018 | MTD - Motion To Dismiss | 12/26/2018 | |
| **NOTE:** Motion to Dismiss // REC#26961288 | | | |
| 12/26/2018 | RES - Response | 12/26/2018 | Plaintiff(1) |
| **NOTE:** PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION TO DISMISS | | | |
| 12/24/2018 | AFS - Affidavit Of Service | 12/26/2018 | |
| **NOTE:** Affidavit of Service | | | |
| 12/18/2018 | SUM - Summons | 12/21/2018 | Plaintiff(1) |
| 12/18/2018 | AFS - Affidavit Of Service | 12/26/2018 | |
| **NOTE:** CITY OF SCOTTSDALE | | | |
| 12/3/2018 | AFS - Affidavit Of Service | 12/3/2018 | Plaintiff(1) |
| **NOTE:** CERTIFICATE OF SERVICE ON DEFENDANT CITY OF SCOTTSDALE | | | |
| 11/28/2018 | 322 - ME: Notice Of Intent To Dismiss | 11/28/2018 | |
| 9/23/2018 | COM - Complaint | 9/25/2018 | Plaintiff(1) |
| 9/23/2018 | CSH - Coversheet | 9/25/2018 | Plaintiff(1) |
| 9/23/2018 | CCS - Cerificate Arbitration - Subject To | 9/25/2018 | Plaintiff(1) |
| 9/23/2018 | ADW - Application Deferral/Waiver | 9/25/2018 | Plaintiff(1) |
| 9/23/2018 | ODF - Order Deferring Court Fees | 9/25/2018 | |

### Case Calendar

**There are no calendar events on file**

### Judgments

**There are no judgments on file**